UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CINDY BRIDWELL | ) | |
| | ) | Case No. |
| Plaintiff | ) | |
| v. | ) | |
| | ) | |
| SUSAN BROWNELL, et al. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION AND
INCORPORATED MEMORANDUM IN SUPPORT**

Pursuant to FRCP 65(a) and Local Rules 65.1(c) and (d), Plaintiff, Cindy

Bridwell, hereby moves for, and submits this memorandum in support of her application

for preliminary injunctive relief. Ms. Bridwell states as follows:

## INTRODUCTION AND SUMMARY OF ARGUMENT

This is an action for declaratory and preliminary and permanent injunctive relief

seeking to require the United States Postal Service ("Postal Service") to lift its

requirement that SLM, Trans, Inc. ("SLM") (a Post Service mail transport contractor)

terminate Ms. Bridwell's employment effective February 29, 2008.

Very briefly put, in the face of a threat from the Postal Service to debar SLM, the

Postal Service has forced SLM to agree (among many other things and seemingly as an

inconsequential afterthought) to terminate Ms. Bridwell (an honest, hardworking low

level fuel-tax administrator)—despite Ms. Bridwell never having received proper notice

of the existence of or the reasoning for the Postal Service's intention to require her

termination, despite the Postal Service never having provided Ms. Bridwell an

opportunity to be properly heard on the subject and despite there being no evidence to

support the need for her termination. SLM has now wrongfully terminated Ms. Bridwell as a result.

In short, the Postal Service has egregiously denied Ms. Bridwell her procedural and substantive due process rights and has completely ignored its own explicit debarment procedures contained in 39 C.F.R. § 601.113. As a result, Ms. Bridwell has been unconstitutionally deprived of her employment and her reputation without due process of law.

Ms. Bridwell meets the four-part test for obtaining injunctive relief: (1) Ms. Bridwell suffers irreparable harm from the violations because of the damage to her livelihood and reputation; (2) the Postal Service and SLM would suffer no harm from her returning to work because Ms. Bridwell has never been charged with or guilty of any violations of Postal Service or SLM policy—in fact, the Postal Service and SLM would benefit from her return because SLM would be re-gaining an exemplary employee; (3) Ms. Bridwell is likely to prevail on the merits as the Postal Service has very clearly provided Ms. Bridwell with absolutely no substantive or procedural due process in depriving her of her livelihood and reputation and SLM has wrongfully terminated Ms. Bridwell; and, (4) the public will benefit because one of the government's mail transport contractors will again have the services of an exemplary employee, thus facilitating the efficient and effective transport of the mail.

## FACTUAL BACKGROUND

### Ms. Bridwell's Employment

Ms. Bridwell, a 42 year old wife and mother of two living in rural and economically depressed Sumner, Illinois, has been an honest, hard working and highly

competent lower level administrator in the mail transportation/fuel and mileage industry for 19 years. During these 19 years, Ms. Bridwell has worked for trucking transport companies, including, among others, Midwest Transit, Inc. ("MWT") (now known as Midwest Transport, Inc. ("MTI"), although Ms. Bridwell never worked for MTI) and Defendant SLM Trans, Inc. ("SLM") (not affiliated with MWT) (collectively "The Companies"). The Postal Service has contracted with each of The Companies at various times to provide transportation of mail over specified highway contract routes ("HCRs") under various HCR contracts. Bridwell Affidavit ¶¶ 1-4.

For these 19 years, her work had focused predominately on maintaining records and interfacing on fuel tax allocation issues with the various states through which her employers' (former and present) routes have run. As an additional part of her duties, Ms. Bridwell had collected The Companies' fuel purchasing data and reported that information to her superiors. Ms. Bridwell's superiors, in turn, reported the fuel purchasing information to the Postal Service for the purpose of obtaining any available fuel purchase reimbursements. There have been others employed by The Companies who have also had as part of their duties the collection and reporting of fuel purchasing data to their superiors, including Grace Wirth (at MWT and SLM), Jenny Hixon-Miller (at MWT and SLM) and Deona Dugger (at MWT and MTI). Ms. Wirth and Ms. Hixon-Miller currently still work at SLM and Ms. Dugger currently still works at MTI. Bridwell Affidavit ¶¶ 5-6.

Importantly, Ms. Bridwell has never herself ever been involved in the certification or submission of any fuel reimbursement claims to the Postal Service. She has merely

collected that information at the direction of her superiors so that her superiors could certify the fuel purchase data to the Postal Service. Bridwell Affidavit ¶ 7.

### The Postal Service's Investigation of MWT, MTI and Hal D. Hicks

MWT was operated by a gentleman named Hal D. Hicks ("Hicks"). Hicks also, on occasion, contracted separately in his own personal name with the Postal Service. After MWT was placed in receivership, the company re-emerged as MTI. Hicks has never operated MTI or SLM. Bridwell Affidavit ¶ 8.

On January 12, 2006, Hicks pled guilty to, *inter alia,* willfully and knowingly making a false, fictitious and fraudulent statement, in that he allegedly falsified a Fuel Use Certification submitted to the Postal Service in connection with the performance of a mail transportation contract with the Postal Service in his own personal name. Bridwell Affidavit ¶ 9.

Fuel Use Certifications were the means by which MWT, Hicks and later MTI requested increases in compensation under their contracts with the Postal Service based on increases in the cost of fuel. Fuel Use Certifications were to include information on the increases in fuel rates and also include an explanation of any discounts on the price paid for fuel. Hicks was purported to have falsified the Fuel Use Certification by failing to report to the Postal Service certain fuel purchase rebates he had received from Pilot Fuel Stations. The Postal Service alleged that this was a failure to report a fuel discount which resulted in the recoupment of an illegal overpayment by Hicks and Hicks alleged, in contrast, that these rebates were not definitionally "discounts" and did not need to be reported to the Postal Service. Bridwell Affidavit ¶¶ 10-11.

Hicks was sentenced to 18 months in jail for his guilty plea to this and other alleged crimes and was debarred by the Postal Service for a three year period, beginning September 29, 2006. Bridwell Affidavit ¶ 12.

The Postal Service then circled back to investigating the past conduct of MWT and the current conduct of MTI in relation to this alleged rebate and fuel certification scheme. As a result of this investigation, the Postal Service filed a lawsuit against MWT/MTI seeking, *inter alia*, reimbursement of the alleged fuel overpayments. Bridwell Affidavit ¶ 13 and Exhibit A, Postal Service Complaint.

The individuals named in that lawsuit as having played a part in MWT's/MTI's allegedly illegal fuel certification process were Hicks, Janie Ensminger, John Elmore and Ken Hohlbaugh. According to the MWT/MTI process, Ensminger, Elmore and Hohlbaugh, under the direction of Hicks, signed fuel certifications which did not disclose the rebates MWT/MTI had received from Pilot. Bridwell Affidavit ¶ 14 and Exhibit A, page 8.

Except for the references to them in the Complaint, Ensminger, Elmore and Hohlbaugh have not been pursued by the Postal Service for debarment or any other remedy. Importantly, the Postal Service's Complaint does not reference Ms. Bridwell as playing any part in the allegedly illegal fuel certification process while at MWT and, furthermore, Ms. Bridwell was never even referenced in the Postal Service's Complaint at all. Bridwell Affidavit ¶¶ 15-16.

As part of the Postal Service's investigation into MWT, the Postal Service did, however, interview Ms. Bridwell to gain an understanding of the fuel price reporting process. Many others were interviewed as well including, notably, Jane Ensminger. Ms.

Bridwell was, however, the only MWT employee who processed fuel purchasing data to have offered her time for the Postal Service interview. No other similarly situated employees were interviewed because, apparently, the Postal Service investigators were able to collect all of the background information they needed from Ms. Bridwell. Bridwell Affidavit ¶ 17 and Exhibit B, Postal Service Investigation.

In its investigation report, the Postal Service described Ms. Bridwell's responsibilities in fuel price reporting as being purely administrative. According to the report, Ms. Bridwell was explicitly instructed by her superiors on how and when to generate fuel certifications. The report does not describe Ms. Bridwell as having any decision-making authority regarding how fuel prices were ultimately generated or reported to the Postal Service. Instead, Ms. Bridwell prepared the fuel certifications completely under the direction of her superiors. Bridwell Affidavit ¶ 18 and Exhibit B, page 3.

Furthermore, the Postal Service's investigation report explicitly states that Ms. Bridwell was "not a Hal Hicks sympathizer" – further indicating her separation from any allegedly illegal schemes or acts undertaken by Hicks and others. Bridwell Affidavit ¶ 19 and Exhibit B, page 1.

Thus, based on the recorded history of the Postal Service's investigation into MWT and MTI, it was determined by the Postal Service that Hicks, Ensminger, Elmore and Hohlbaugh were the culprits in the companies' alleged fuel certification scheme— and, according to the documentation, Bridwell was not criminally or civilly responsible to any degree. Bridwell Affidavit ¶ 20.

### The Postal Service's Investigation of SLM

Some time after her resignation from MWT, Ms. Bridwell went to work for SLM, a company owned by Shelly Myles ("Myles"). Myles is the daughter of Hicks. Bridwell Affidavit ¶ 21.

Following the discipline levied on Hicks and based on the perceived affiliation between Myles and Hicks, the Postal Service suspended and proposed to debar Myles and SLM. However, in order to avoid debarment, the Postal Service proposed and Myles and SLM agreed to take certain actions to assure the Postal Service that Myles and SLM had severed any previous alleged ties to Hicks. Bridwell Affidavit ¶ 22-23 and Exhibit C, Settlement Agreement.

During the negotiation of the Settlement Agreement, the Postal Service explicitly described the actions Myles and SLM must take to demonstrate their complete severing of business and financial connections to Hicks. Bizarrely and unexpectedly, however, the Postal Service stated, at the eleventh hour of negotiations, that it would not enter into the Settlement Agreement unless, in essence, individuals previously employed by Hicks were terminated within six months. Bridwell Affidavit ¶¶ 24-25 and Exhibit C, page 4.

The Postal Service inexplicably singled out *only* Ms. Bridwell as someone who had been previously employed by Hicks (at MWT) and, despite her lack of allegiance to Hicks, demanded that she be terminated. The Postal Service never gave any detailed explanation whatsoever for their demand that Ms. Bridwell be terminated to SLM, Myles, Ms. Bridwell or anyone else. Furthermore, the Postal Service never gave any explanation as to why Ms. Bridwell was singled out, even though other SLM employees (Ms. Wirth

and Ms. Hixon-Miller) had also previously worked for Hal Hicks at MWT and has also been involved in fuel purchase reporting. Bridwell Affidavit ¶ 25.

With their backs against the wall and desperately needing to release the specter of suspension and possible debarment, SLM agreed to the provision, hoping that it would not ultimately be enforced by the Postal Service. Bridwell Affidavit ¶ 26 and Exhibit D, SLM Letter, page 2.

Amazingly, the Postal Service never notified Ms. Bridwell of her required termination and never initiated any sort of Postal Service debarment proceedings as mandated by 39 C.F.R. § 601.113. Instead, in an unabashed and seemingly very deliberate attempt to completely ignore the mandates of 39 C.F.R. § 601.113, Ms. Bridwell's constitutional due process rights and its own investigation report which found that Ms. Bridwell was not a Hicks sympathizer (Exhibit B), the Postal Service summarily effectively de facto debarred Ms. Bridwell (a hardworking, honest and humble employee who had never been previously charged with any wrongdoing) without justification, notification or appropriate procedural process. Bridwell Affidavit ¶¶ 27-28.

Perhaps the most baffling part of this development was that the Postal Service did not seek the debarment of any of the other individuals at MWT/MTI (Ensminger, Elmore or Hohlbaugh) who *were* specifically cited by the Postal Service in its lawsuit as having a hand in the allegedly illegal fuel certification scheme (Exhibit A)—nor any other individuals who performed the exact same duties for Hicks as Ms. Bridwell while at MWT (Wirth, Hixon-Miller or Dugger). Apparently, Ms. Bridwell was just very unlucky to have been on the Postal Service's radar screen as someone who had previously worked

for Hicks—despite her lack of allegiance to Hicks, as noted in the Postal Service's own investigation report. Bridwell Affidavit ¶ 29 and Exhibit B, page 1.

At the request of SLM and Myles, Ms. Bridwell's termination date has been extended to February 29, 2008 but, after that date, the Postal Service demands that Ms. Bridwell be terminated immediately. Bridwell Affidavit ¶ 30.

### SLM, Myles' and Bridwell's Pleas for Leniency

In an attempt to get the Postal Service to reconsider its requirement that Ms. Bridwell be terminated (i.e. to reconsider its debarment of her), SLM, Myles and Ms. Bridwell wrote to the Postal Service pleading for leniency. Bridwell Affidavit ¶ 31.

In a November 29, 2007 letter, Myles, on behalf of SLM, wrote to Susan Brownell, Vice President of Supply Management for the Postal Service, indicating how vital Ms. Bridwell is to SLM and how devastating her termination would be to SLM and to Ms. Bridwell. Exhibit D to Bridwell Affidavit. Myles described Ms. Bridwell as "an outstanding employee for SLM, with irreplaceable experience in all of the administrative areas supporting SLM's Postal Service contract performance." Exhibit D, page 2. Myles went on to say that she has "attempted to find and hire a suitable replacement for Ms. Bridwell. However, there is no one in the southern Illinois vicinity of our Sumner, Illinois offices with any experience in this business. Moreover, there is not practical or feasible way to replace Ms. Bridwell's 19 years of experience and intimate knowledge of the requirements of the many states with which SLM has to deal on state fuel tax issues, as well as the applicable DOT driver log requirements." Exhibit D, page 2. Importantly, Ms. Bridwell's expertise in fuel tax and driver log issues is not shared by any other

employees of SLM, including Ms. Wirth and Ms. Hixon-Miller.  Bridwell Affidavit ¶¶
31-34.

Myles continued by, again, stating that Ms. Bridwell "has no role in SLM's
bidding or pricing of contracts, and does not prepare, certify or submit any claims on
SLM's behalf to the Postal Service" and, therefore, poses no risks to the Postal Service
whatsoever.  Bridwell Affidavit ¶ 35 and Exhibit D, page 3.

Myles concluded her letter by requesting that Ms. Bridwell be allowed to continue
to be employed by SLM "pending a decision after due process notice to her of any claims
and an opportunity to respond thereto, as provided in the Postal Service regulations."
Bridwell Affidavit ¶ 36 and Exhibit D, page 3.

Ms. Bridwell also wrote a letter to Ms. Brownell at the Postal Service.  Exhibit E
to Bridwell Affidavit (Bridwell Letter).  In that letter, Ms. Bridwell described how
desperate her family's financial and physical wellbeing would be if she were terminated
and debarred.  Ms. Bridwell described the impossibility of finding a job near Sumner,
Illinois paying similar wages to what she makes at SLM and indicated how her small
children and her diabetic husband are dependent upon her SLM income and health
benefits to survive.  Bridwell Affidavit ¶ 37.

Without any modicum of procedural due process or even an explanation afforded
to Ms. Bridwell as to exactly how she posed a threat to SLM or the Postal Service (other
than, vaguely, her previous employment by Hicks), the Postal Service summarily denied
SLM's and Ms. Bridwell's pleas.  Bridwell Affidavit ¶ 38 and Exhibit F, Postal Service
Letter.  As a result, SLM was forced to write a termination letter to Ms. Bridwell on

February 12, 2008 which Ms. Bridwell received on February 20, 2008—nine days before her termination. Bridwell Affidavit ¶ 39 and Exhibit G, Termination Letter.

### Harm to Ms. Bridwell and Her Family

As indicated above, Ms. Bridwell and her family will be devastated by the Postal Service's actions after she is terminated on February 29, 2008. Ms. Bridwell has no college education and, if she is terminated and thereby deprived of her livelihood, her family will essentially be destitute because similarly paying employment is virtually non-existent in Sumner, Illinois and because her diabetic husband's small construction business is on the brink of bankruptcy. Bridwell Affidavit ¶¶ 40-41 and Exhibit E, page 1.

Ms. Bridwell has searched for other jobs but has been unable to locate any employment paying anything close to what she is currently making. Bridwell Affidavit ¶ 42.

In short, if the Postal service continues to require Ms. Bridwell's termination and de facto debarment, Ms. Bridwell will be unemployed and she and her family will be placed in a financially ruinous situation. Furthermore, Ms. Bridwell's termination has and will continue to defame and stigmatize Ms. Bridwell. The bald assertion that her previous employment by Hicks somehow makes her guilty of the crimes he allegedly committed is a public statement suggesting that Ms. Bridwell is a criminal or, at the very least, a person who engages in fraud and deceit. Other employees of SLM, residents of Sumner, Illinois and also employees of the Postal Service are aware of the alleged reasoning for Ms. Bridwell's termination and Ms. Bridwell's reputation has suffered and will continue to suffer in the future as a result—especially in the sense that the Postal

Service's defamation of Ms. Bridwell will harm her ability to obtain future employment from any future employer. Bridwell Affidavit ¶¶ 43-44.

## ARGUMENT

In ruling on a request for preliminary injunctive relief, the Court must consider four factors: (1) the likelihood of irreparable harm to the plaintiff if the injunction is denied; (2) the likelihood of harm to the defendant if the relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and, (4) whether the public interest will be served by the injunction. *Katz v. Georgetown Univ., 246* F.3d 685, 687-88 (D.C.Cir.2001) (internal quotations omitted). These factors interrelate on a sliding scale and must be balanced against each other. *Davenport v. International Brotherhood of Teamsters, AFL-CIO*, 166 F.3d 356, 361 (D.C.Cir.1999); *Dodd v. Fleming*, 223 F.Supp.2d 15, 19 (D.D.C.2002).

Here, all four factors support the immediate entry of a preliminary injunction.

## I.    Ms. Bridwell Will Suffer Irreparable Harm Without the Entry of Injunctive Relief.

Ms. Bridwell will suffer irreparable harm from Defendants' conduct because of the damage to her livelihood and reputation.  In each case, monetary compensation alone is insufficient to afford complete redress.

### A.    Irreparable Economic Harm

As indicated above, Ms. Bridwell and her family will be devastated by the Postal Service's and SLM's actions after she is terminated on February 29, 2008.  Ms. Bridwell has no college education and, if she is terminated and thereby deprived of her livelihood, her family will essentially be destitute because similarly paying employment is virtually non-existent in Sumner, Illinois and because her diabetic husband's small construction

business is on the brink of bankruptcy. Bridwell Affidavit ¶¶ 40-41 and Exhibit E, page 1.

Ms. Bridwell has searched for other jobs but has been unable to locate any employment paying anything close to what she is currently making—either in the industry in which she has enjoyed developing an expertise over the past 19 years or in any other industries.

Furthermore, without the injunction, Ms. Bridwell would not only be harmed in the sense of losing her wages but she would also be harmed in the sense that she will likely never be able to return to the industry she has enjoyed so much over the past 19 years. Instead, Ms. Bridwell and her family will have to attempt to get by on a much less significant wage *and* Ms. Bridwell herself will be required to leave her chosen profession.

Irreparable loss of income or business opportunities *does* constitute irreparable harm. Such losses are difficult, if not impossible to quantify monetarily, rendering injunctive relief appropriate. *See, e.g. Allegheny Energy, Inc. v. DQE, Inc.* 171 F.3d 153 (3d Cir. 1999) (irreparable harm where plaintiff corporation would lose business opportunity to merge with another corporation in absence of injunction); *Coastal Distr., LLC v. Town of Babylon*, 2005 U.S. Dist. LEXIS 40795, *62 (E.D.N.Y. 2005) (finding irreparable harm in part due to plaintiff's loss of "future contracts and market opportunities). Ms. Bridwell's monetary and professional losses are similarly irreparable and substantial.

### B.    Irreparable Reputational Harm

As indicated above, Ms. Bridwell's termination has and will continue to defame and stigmatize Ms. Bridwell. The bald assertion that her previous employment by Hicks somehow makes her guilty of the crimes he allegedly committed is a public statement suggesting that Ms. Bridwell is a criminal or, at the very least, a person who engages in fraud and deceit—thus ruining the reputation she has invested 19 years in building. Other employees of SLM, residents of Sumner, Illinois and also employees of the Postal Service are aware of the alleged reasoning for Ms. Bridwell's termination and Ms. Bridwell's reputation has suffered and will continue to suffer in the future as a result— especially in the sense that the Postal Service's defamation of Ms. Bridwell will harm her ability to obtain future employment from any future employer. Bridwell Affidavit ¶¶ 43-44.

Courts have regularly found "irreparable harm" sufficient to enter a preliminary injunction when a plaintiff alleges the loss of reputation and goodwill. *Bellsouth Telecom v. MCI Metro*, 425 F.2d 964, 970 (11th Cir. 2005). For example, in *United Health Care Inc. Co. v. Advancepcs*, 316 F.3d 737, 741 (8th Cir. 2002), the Eight Circuit upheld the District Court's entry of a preliminary injunction barring the defendant from continuing to process claims presented by the plaintiff insurance company's members using outdated billing codes. The court found that customers were likely to blame the plaintiff for the resulting problems, damaging plaintiff's reputation: "[l]oss of tangible assets such as reputation and goodwill can constitute irreparable injury." *Id.* at 741. *see also*, *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (upholding District Court's finding that defendant's actions "would cause [plaintiff] irreparable harm through

loss of reputation, goodwill, and business opportunities") and *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) ("the loss of customers and goodwill is an 'irreparable injury'").

It is impossible to monetarily quantify the losses Ms. Bridwell has suffered and continues to suffer as a result of the Postal Service's arbitrary and unjustified requirement that she be terminated. In the absence of a preliminary injunction, Ms. Bridwell will suffer tremendous and irreparable economic and reputational harm.

## II.    Neither The Postal Service Nor SLM will Suffer Harm If An Injunction Is Granted

In contrast, neither the Postal Service nor SLM will suffer any harm if a preliminary or permanent injunction is granted and Ms. Bridwell is permitted to continue working for SLM.

As evidenced by SLM's letter to the Postal Service (Exhibit D to Bridwell Affidavit) and SLM's termination letter (Exhibit G to Bridwell Affidavit), Ms. Bridwell is an exemplary employee and has been so for over 19 years. Ms. Bridwell's work has led to very efficient tax, fuel and mileage reporting which has been of great assistance to SLM and, ultimately, the Postal Service.

The Postal Service cannot legitimately argue that it could possibly be harmed by Ms. Bridwell continuing to be employed by SLM. Not only has Ms. Bridwell never been informally or formally charged with any wrongdoing, she has, in fact, never committed any acts deleterious to the Postal Service. Furthermore, even if Ms. Bridwell were guilty of some sort of wrongdoing (which she emphatically denies), the Postal Service can be assured that Ms. Bridwell would never commit such an act again given the level of scrutiny under which she would be working in those circumstances.

Allowing Ms. Bridwell to resume performance of her contracts will have only one, entirely predicable result: both the Postal Service and SLM will once again benefit from Ms. Bridwell's exemplary work product.

**III.    Ms. Bridwell Has A Strong Likelihood Of Success On The Merits**

Based on the Postal Service's recent litigation failures in de facto debarment cases similar to this one (such as *Joyce v. Potter* in the United States District Court for the Middle District of Florida, Ocala Division (Final Order attached as Exhibit 1) in which the Postal Service's debarment was enjoined and the Postal Service was required to pay the plaintiff's attorney's fees), one would think that the Postal Service would have learned its lesson in cases such as this. However, it appears that the Postal Service is intent upon depriving law-abiding contractors and employees of contractors of their due process rights.

Ms. Bridwell's likelihood of success on the merits is very high. The Postal Service's action in requiring her termination was irrational, arbitrary and capricious and presents a clear and obvious deprivation of her due process rights, liberty interests, and property interests under the Fifth Amendment to the United States Constitution. Furthermore, SLM has clearly wrongfully terminated Ms. Bridwell under the circumstances. She is thus highly likely to prevail on the merits of this action.

Excluding a contractor or their employees from other contract opportunities is not allowed outside of an agency's formal debarment procedures. *Myers & Myers, Inc. v. United States Postal Serv.*, 527 F.2d 1252 (2d Cir. 1975); *Dynamic Aviation v. Dept. of Interior*, 898 F. Supp. 11 (D.D.C. 1995); *Art-Metal USA, Inc. v. Solomon*, 473 F. Supp. 1 (D.D.C. 1978); *Peter Kiewit & Sons Co. v. United States Army Corps of Eng'rs*, 534

F.Supp. 1139 (D.D.C. 1982), *rev'd on other grounds*, 714 F.3d 163 (D.C.Cir. 1983).

The Postal Service's determination to deprive Ms. Bridwell of her employment and service to the Postal Service also violates her liberty interest to be free from government defamation and stigmatizing accusations without due process of law. *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953 (D.C. Cir. 1980); *Related Indus., Inc. v. United States* 2 Cl. Ct. 517 (1983).

It is undeniable that the Postal Service never personally gave Ms. Bridwell notice of the action against her (i.e. the inclusion of the requirement in the Settlement Agreement that she be terminated), an explanation of the evidence it possessed against Ms. Bridwell or an opportunity to respond to the Postal Service's allegations before they required that she be terminated in the Settlement Agreement.

Instead, with virtually no investigation into whether Ms. Bridwell was somehow to blame for the alleged misconduct of Hicks, the Postal Service summarily required her dismissal without any notice or an opportunity to be heard. Even in the face of SLM's pleas to give Ms. Bridwell an opportunity to present her case, the Postal Service ignored all input and hastily required that Ms. Bridwell be terminated. Exhibit D to Bridwell Affidavit.

Therefore, it is abundantly clear that the Postal Service's decision to require Ms. Bridwell's termination without providing for notice and an opportunity to be heard and without reliance on any persuasive or credible evidence was irrational, arbitrary, capricious and completely violative of her procedural and substantive due process rights.

## IV.    Preliminary Injunctive Relief Would Serve the Public Interest

The public will certainly benefit if Ms. Bridwell is retained by SLM. As mentioned above, Ms. Bridwell is an exemplary employee and her retention will allow one of the Postal Service's mail transport contractors to again have the services of an outstanding employee, thus facilitating the efficient and effective transport of the mail.

Furthermore, if injunctive relief were not granted, the public interest would be deleteriously affected. If this case were to provide a precedential effect for other government agencies to be able to arbitrarily and capriciously debar their contractors and their contractors' employees, then contractors and their employees would be hesitant to work for the government for fear that they would be summarily dismissed without justification or a hearing. Such a scenario could lead to a substantial diminution in the quality of contractors available to provide goods and services to the United States government.

## CONCLUSION

For the foregoing reasons, Ms. Bridwell requests that the Court grant a preliminary, and ultimately permanent, injunction: (1) declaring that the Postal Service's requirement that Ms. Bridwell be terminated and debarred was a violation of Ms. Bridwell's procedural and substantive due process rights, and that it improperly stigmatized and defamed Ms. Bridwell's reputation for honesty, integrity and responsibility; (2) requiring the Postal Service and SLM to excise that portion of the Settlement Agreement that requires SLM to terminate Ms. Bridwell's employment and requiring SLM to retain Ms. Bridwell in her current position without recourse from the Postal Service; (3) barring the Postal Service from requiring Ms. Bridwell's termination,

suspension or any other action against her in relation to her affiliation with Hicks or MWT, unless such action is based on new information or new allegations that were not previously known or previously investigated, and then only in accordance with due process of law; (4) barring the Postal Service from suspending or debarring Ms. Bridwell from working on or bidding on any Postal Services contracts, except in compliance with its published suspension and debarment regulations and in accordance with due process of law; and, (5) granting further relief to Ms. Bridwell as the Court deems just and equitable.

Respectfully submitted,

Christopher C. S. Manning
Manning & Sossamon, PLLC
DC Bar No. 471315
1120 20th Street, NW
North Building, Suite 700
Washington, DC 20036
(202) 973-2681 (voice)
(202) 973-1212 (fax)
cmanning@manning-sossamon.com

## CERTIFICATE OF SERVICE

I, Christopher Manning, certify that on February 27, 2008 I sent a copy of the foregoing as follows:

William Jones, Esquire at william.j.jones@usps.gov and
475 L'Efant Plaza, SW
Washington, DC 20260-0010

Susan Witt at susan.a.witt@usps.gov and (202) 268-6234 (fax) and
475 L'Efant Plaza, SW
Washington, DC 20260-0010

Susan Brownell at susan.m.brownell@usps.gov and (202) 268-6234 (fax)
and
475 L'Efant Plaza, SW
Washington, DC 20260-0010

Hopewell H. Darneille, Esquire
Thompson Coburn LLP
1909 K Street, NW, Suite 600
Washington, DC 20006
hdarneille@thompsoncoburn.com

Christopher Manning 471315

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CINDY BRIDWELL** | ) | |
| | ) | **Case No.** |
| **Plaintiff** | ) | |
| **v.** | ) | |
| | ) | |
| **SUSAN BROWNELL, et al.** | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Upon consideration of the Plaintiff's Application for Preliminary Injunction, it is

this _____ day of _____, 2008 hereby ordered that:

The Application is hereby GRANTED and a Preliminary Injunction is hereby

issued as follows: (1) declaring that the Postal Service's requirement that Ms. Bridwell be

terminated and debarred was a violation of Ms. Bridwell's procedural and substantive

due process rights, and that it improperly stigmatized and defamed Ms. Bridwell's

reputation for honesty, integrity and responsibility; (2) requiring the Postal Service and

SLM to excise that portion of the Settlement Agreement that requires SLM to terminate

Ms. Bridwell's employment and requiring SLM to retain Ms. Bridwell in her current

position without recourse from the Postal Service; (3) barring the Postal Service from

requiring Ms. Bridwell's termination, suspension or any other action against her in

relation to her affiliation with Hicks or MWT, unless such action is based on new

information or new allegations that were not previously known or previously

investigated, and then only in accordance with due process of law; and, (4) barring the

Postal Service from suspending or debarring Ms. Bridwell from working on or bidding on

any Postal Services contracts, except in compliance with its published suspension and

debarment regulations and in accordance with due process of law.

_____

Judge

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CINDY BRIDWELL** | ) | |
| | ) | **Case No.** |
| **Plaintiff** | ) | |
| v. | ) | |
| | ) | |
| **SUSAN BROWNELL, et al.** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## AFFIDAVIT OF CINDY BRIDWELL

Before me, the undersigned authority, personally appeared Cindy Bridwell, known to me to be the person whose name is subscribed to this instrument, who, after first being duly sworn by me, upon oath and under penalty of perjury, stated:

1. I, Cindy Bridwell, am at least 18 years of age, am a United States citizen and am competent to testify herein.

2. I am a 42 year old wife and mother of two living in rural and economically depressed Sumner, Illinois. I have always been thought of as an honest, hard working and highly competent lower level administrator in the mail transportation/fuel and mileage industry.

3. For 19 years, I have worked for trucking transport companies, including, among others, Midwest Transit, Inc. ("MWT") (now known as Midwest Transport, Inc. ("MTI"), although I never worked for MTI) and Defendant SLM Trans, Inc. ("SLM") (not affiliated with MWT) (collectively "The Companies").

4.    The Postal Service has contracted with each of The Companies at various times to provide transportation of mail over specified highway contract routes ("HCRs") under various HCR contracts.

5.    For these 19 years, my work had focused predominately on maintaining records and interfacing on fuel tax allocation issues with the various states through which my employers' (former and present) routes have run.

6.    As an additional part of my duties, I had collected The Companies' fuel purchasing data and reported that information to my superiors. My superiors, in turn, reported the fuel purchasing information to the Postal Service for the purpose of obtaining any available fuel purchase reimbursements. There have been others employed by The Companies who have also had as part of their duties the collection and reporting of fuel purchasing data to their superiors, including Grace Wirth (at MWT and SLM), Jenny Hixon-Miller (at MWT and SLM) and Deona Dugger (at MWT and MTI). Ms. Wirth and Ms. Hixon-Miller currently still work at SLM and Ms. Dugger currently still works at MTI.

7.    Importantly, I have never been involved in the certification or submission of any fuel reimbursement claims to the Postal Service. I have merely collected that information at the direction of my superiors so that my superiors could certify the fuel purchase data to the Postal Service.

**The Postal Service's Investigation of MWT, MTI and Hal D. Hicks**

8.    MWT was operated by a gentleman named Hal D. Hicks ("Hicks"). Hicks also, on occasion, contracted separately in his own personal name with the

Postal Service. After MWT was placed in receivership, the company re-emerged as MTI. Hicks has never operated MTI or SLM.

9.    On January 12, 2006, Hicks pled guilty to, *inter alia,* willfully and knowingly making a false, fictitious and fraudulent statement, in that he allegedly falsified a Fuel Use Certification submitted to the Postal Service in connection with the performance of a mail transportation contract with the Postal Service in his own personal name.

10.    Fuel Use Certifications were the means by which MWT, Hicks and later MTI requested increases in compensation under their contracts with the Postal Service based on increases in the cost of fuel. Fuel Use Certifications were to include information on the increases in fuel rates and also include an explanation of any discounts on the price paid for fuel.

11.    My understanding is that Hicks was purported to have falsified the Fuel Use Certification by failing to report to the Postal Service certain fuel purchase rebates he had received from Pilot Fuel Stations. The Postal Service alleged that this was a failure to report a fuel discount which resulted in the recoupment of an illegal overpayment by Hicks and Hicks alleged, in contrast, that these rebates were not definitionally "discounts" and did not need to be reported to the Postal Service.

12.    Hicks was sentenced to 18 months in jail for his guilty plea to this and other alleged crimes and was debarred by the Postal Service for a three year period, beginning September 29, 2006.

13.    My understanding is that the Postal Service then circled back to investigating

the past conduct of MWT and the current conduct of MTI in relation to this

alleged rebate and fuel certification scheme.  As a result of this investigation,

the Postal Service filed a lawsuit against MWT/MTI seeking, *inter alia*,

reimbursement of the alleged fuel overpayments.  Exhibit A, Postal Service

Complaint.

14.    The individuals named in that lawsuit as having played a part in

MWT's/MTI's allegedly illegal fuel certification process were Hicks, Janie

Ensminger, John Elmore and Ken Hohlbaugh.  According to the MWT/MTI

process, Ensminger, Elmore and Hohlbaugh, under the direction of Hicks,

signed fuel certifications which did not disclose the rebates MWT/MTI had

received from Pilot.  Exhibit A, page 8.

15.    Except for the references to them in the Complaint, Ensminger, Elmore and

Hohlbaugh have not been pursued by the Postal Service for debarment or any

other remedy.

16.    Importantly, the Postal Service's Complaint does not reference me as playing

any part in the allegedly illegal fuel certification process and, furthermore, I

was never even referenced in the Postal Service's Complaint at all.

17.    As part of the Postal Service's investigation into MWT, the Postal Service did,

however, interview me to gain an understanding of the fuel price reporting

process.  Exhibit B, Postal Service Investigation.  Many others were

interviewed as well including, notably, Jane Ensminger.  I was, however, the

only MWT employee who processed fuel purchasing data to have offered

their time for the Postal Service interview.  No other similarly situated employees were interviewed because, apparently, the Postal Service investigators were able to collect all of the background information they needed from me.

18.    In its investigation report, the Postal Service described my responsibilities in fuel price reporting as being purely administrative.  According to the report, I was explicitly instructed by my superiors on how and when to generate fuel certifications.  The report does not describe me as having any decision-making authority regarding how fuel prices were ultimately generated or reported to the Postal Service.  Instead, I prepared the fuel certifications completely under the direction of my superiors.  Exhibit B, page 3.

19.    Furthermore, the Postal Service's investigation report explicitly states that I was "not a Hal Hicks sympathizer" – further indicating my separation from any allegedly illegal schemes or acts undertaken by Hicks and others.  Exhibit B, page 1.

20.    Thus, based on the recorded history of the Postal Service's investigation into MWT and MTI, it was determined by the Postal Service that Hicks, Ensminger, Elmore and Hohlbaugh were the culprits in the companies' alleged fuel certification scheme—and, according to the documentation, I was not criminally or civilly responsible to any degree.

## The Postal Service's Investigation of SLM

21.    Some time after my resignation from MWT, I went to work for SLM, a company owned by Shelly Myles ("Myles").  Myles is the daughter of Hicks.

22.    Following the discipline levied on Hicks and based on the perceived affiliation between Myles and Hicks, my understanding is that the Postal Service suspended and proposed to debar Myles and SLM.

23.    However, in order to avoid debarment, my understanding is that the Postal Service proposed and Myles and SLM agreed to take certain actions to assure the Postal Service that Myles and SLM had severed any previous alleged ties to Hicks.  Exhibit C, Settlement Agreement.

24.    During the negotiation of the Settlement Agreement, my understanding is that the Postal Service explicitly described the actions Myles and SLM must take to demonstrate their complete severing of business and financial connections to Hicks.

25.    Bizarrely and unexpectedly, however, my understanding is that the Postal Service stated, at the eleventh hour of negotiations, that it would not enter into the Settlement Agreement unless, in essence, individuals previously employed by Hicks were terminated within six months.  Exhibit C, page 4.  The Postal Service inexplicably singled out *only* me as someone who had been previously employed by Hicks (at MWT) and, despite my lack of allegiance to Hicks, demanded that I be terminated.  The Postal Service never gave any detailed explanation whatsoever for their demand that I be terminated to SLM, Myles, me or anyone else.  Furthermore, the Postal Service never gave any explanation as to why I was singled out, even though other SLM employees (Ms. Wirth and Ms. Hixon-Miller) had also previously worked for Hal Hicks at MWT and has also been involved in fuel purchase reporting.

26.    My understanding is that SLM agreed to the provision, hoping that it would not ultimately be enforced by the Postal Service.  Exhibit D, SLM Letter, page 2.

27.    Amazingly, the Postal Service never notified me of my required termination and never initiated any sort of Postal Service debarment proceedings as mandated by 39 C.F.R. § 601.113.

28.    Instead, in an unabashed and seemingly very deliberate attempt to completely ignore the mandates of 39 C.F.R. § 601.113, my constitutional due process rights and its own investigation report which found that I was not a Hicks sympathizer (Exhibit B), the Postal Service summarily effectively de facto debarred me without justification, notification or appropriate procedural process.

29.    Perhaps the most baffling part of this development was that the Postal Service did not seek the debarment of any of the other individuals at MWT/MTI (Ensminger, Elmore or Hohlbaugh) who *were* specifically cited by the Postal Service in its lawsuit as having a hand in the allegedly illegal fuel certification scheme (Exhibit A)—nor any other individuals who performed the exact same duties for Hicks as me while at MWT (Wirth, Hixon-Miller or Dugger).  Apparently, I was just very unlucky to have been on the Postal Service's radar screen as someone who had previously worked for Hicks—despite my lack of allegiance to Hicks, as noted in the Postal Service's own investigation report.  Exhibit B, page 1.

30.     At the request of SLM and Myles, my termination date has been extended to February 29, 2008 but, after that date, the Postal Service demands that I be terminated immediately.

### SLM, Myles' and Bridwell's Pleas for Leniency

31.     In an attempt to get the Postal Service to reconsider its requirement that I be terminated (i.e. to reconsider its debarment of her), SLM, Myles and I wrote to the Postal Service pleading for leniency.

32.     In a November 29, 2007 letter, Myles, on behalf of SLM, wrote to Susan Brownell, Vice President of Supply Management for the Postal Service, indicating how vital I am to SLM and how devastating my termination would be the SLM and to my family.  Exhibit D.

33.     Myles described me as "an outstanding employee for SLM, with irreplaceable experience in all of the administrative areas supporting SLM's Postal Service Contract performance."  Exhibit D, page 2.

34.     Myles went on to say that I have "attempted to find and hire a suitable replacement for Ms. Bridwell.  However, there is no one in the southern Illinois vicinity of our Sumner, Illinois offices with any experience in this business.  Moreover, there is not practical or feasible way to replace Ms. Bridwell's 19 years of experience and intimate knowledge of the requirements of the many states with which SLM has to deal on state fuel tax issues, as well as the applicable DOT driver log requirements."  Exhibit D, page 2. Importantly, my expertise in fuel tax and driver log issues is not shared by any other employees of SLM, including Ms. Wirth and Ms. Hixon-Miller.

35.    Myles continued by, again, stating that I have "no role in SLM's bidding or
       pricing of contracts, and does not prepare, certify or submit any claims on
       SLM's behalf to the Postal Service" and, therefore, poses no risks to the
       Postal Service whatsoever.  Exhibit D, page 3.

36.    Myles concluded her letter by requesting that I be allowed to continue to be
       employed by SLM "pending a decision after due process notice to her of any
       claims and an opportunity to respond thereto, as provided in the Postal Service
       regulations."  Exhibit D, page 3.

37.    I also wrote a letter to Ms. Brownell at the Postal Service.  Exhibit E, Bridwell
       Letter.  In that letter, I described how desperate my family's financial and
       physical wellbeing would be if I were terminated and debarred.  I described
       the impossibility of finding a job near Sumner, Illinois paying similar wages
       to what I make at SLM and indicated how my small children and my diabetic
       husband are dependent upon my SLM income and health benefits to survive.

38.    Without any modicum of procedural due process or even an explanation
       afforded to me as to exactly how I posed a threat to SLM or the Postal Service
       (other than, vaguely, my previous employment by Hicks), the Postal Service
       summarily denied SLM's and my pleas.  Exhibit F, Postal Service Letter.

39.    As a result, SLM was forced to write a termination letter to me on February
       12, 2008 which I received on February 20, 2008—nine days before my
       termination.  Exhibit G, Termination Letter.

### Harm to Ms. Bridwell and Her Family

40.   As indicated above, my family and I will be devastated by the Postal Service's actions after I am terminated on February 29, 2008.

41.   I have no college education and, if I am terminated and thereby deprived of my livelihood, my family will essentially be destitute because similarly paying employment is virtually non-existent in Sumner, Illinois and because my diabetic husband's small construction business is on the brink of bankruptcy. See, Exhibit E, page 1.

42.   I have searched for other jobs but have been unable to locate any employment paying anything close to what I am currently making.

43.   In short, if the Postal service continues to require my termination and de facto debarment, I will be unemployed and my family and I will be placed in a financially ruinous situation.

44.   Furthermore, my termination has and will continue to defame and stigmatize me. The bald assertion that my previous employment by Hicks somehow makes me guilty of the crimes he allegedly committed is a public statement suggesting that I am a criminal or, at the very least, a person who engages in fraud and deceit. Other employees of SLM, residents of Sumner, Illinois and also employees of the Postal Service are aware of the alleged reasoning for my termination and my reputation has suffered and will continue to suffer in the future as a result—especially in the sense that the Postal Service's defamation of me will harm my ability to obtain future employment from any future employer.

FURTHER AFFIANT SAYETH NOT.

Executed this 26 day of February 2008 in Feb., Illinois

*Cindy Bridwell*

Cindy Bridwell

STATE OF ILLINOIS            )
                             )
COUNTY OF Law,               )

The foregoing instrument was sworn to and subscribed before me this 26 day of February, 2008, by Cindy Bridwell, who is personally known to me or who has produced D. L. _____ (type of identification) as identification.

*Betty L. Brian*
NOTARY PUBLIC
STATE OF ILLINOIS

*Betty L. Brian*
(Print, Type or Stamp Commissioned Name of Notary Public)

OFFICIAL SEAL
BETTY L. BRIAN
Notary Public, State of Illinois
My Commission Expires: 02/29/08