IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CINDY BRIDWELL, | ) |
| *Plaintiff,* | ) |
| v. | ) Civil Action No. 1:08-cv-00345 |
| SUSAN BROWNELL, et al., | ) |
| *Defendants*. | ) |

## RESPONSE OF DEFENDANT SLM TRANS, INC. TO
## PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION

Defendant SLM Trans, Inc. ("SLM"), through its undersigned counsel, respectfully submits the following response to the Application for a Preliminary Injunction filed by Plaintiff Cindy Bridwell ("Bridwell"). This response includes and is supported by the accompanying Declaration of Shelly Myles, SLM's owner, President and CEO, and Exhibits A-D attached thereto.

### EXECUTIVE SUMMARY

Bridwell claims that the Postal Service violated her constitutional due process and liberty interests by requiring SLM to terminate Bridwell's employment at SLM, without the Postal Service first giving Bridwell notice of and an opportunity to respond to the Postal Service's apparent, but undisclosed, concerns motivating this drastic and unusual action.

As Bridwell's employer, SLM is a necessary party to this action. However, SLM itself is not alleged to have done anything wrong. Rather, SLM is merely the instrument used by the

Postal Service, under coercive circumstances, to allegedly violate Bridwell's constitutional rights.

SLM therefore has no real part to play in the instant matter except to ensure that the Court understands that (1) SLM, in discharging Bridwell, did only what the Postal Service forced SLM to do, (2) SLM believes that Bridwell has been a conscientious, hard-working, loyal and valuable employee of SLM, and that SLM would be willing to retain her as an employee if the Postal Service would relent from its insistence that she be fired, but that (3) SLM cannot voluntarily agree to retain Bridwell as an employee, and would be irreparably injured by any requirement to retain her, unless the Postal Service relents and drops its requirement that SLM terminate Bridwell's employment, or this Court determines that the Postal Service's requirement that SLM fire Bridwell is unlawful and unenforceable.

## FACTS

As set forth in more detail in the accompanying Declaration of Shelly Myles ("Myles Decl."), the Postal Service fully investigated the alleged improper fuel schemes of Midwest Transit over a four-year period, and has long been aware of Bridwell's limited role therein. Indeed, the Postal Service's Office of Inspector General ("OIG") interviewed Bridwell, and, to SLM's understanding, Bridwell fully cooperated with the OIG. The OIG further interviewed senior and more intricately involved Midwest Transit personnel, including Janie Ensminger ("Ensminger"). Tellingly, Ensminger informed the OIG that Bridwell was "not a Hicks sympathizer," and Bridwell was kept on as an employee at Midwest Transit when that company got rid of all the Hicks sympathizers (see Cmplt Exh. B, at 1-2).

The OIG's report of its four-year investigation does not assert that Bridwell did anything wrong, and the OIG did not recommend that the Postal Service suspend or debar Bridwell (Myles Decl. ¶ 14, at 4, and Exh. B). However, the Postal Service never raised any

concern to SLM in such regard throughout the course of the extended proceedings on SLM's challenge to the Postal Service's suspension and proposed debarment of SLM (*id.*, ¶ 14, at 4).

Rather, Bridwell's name and the Postal Service's asserted concerns about her continued employment at SLM did not surface until virtually the last minute of prolonged negotiations as to the terms of a settlement agreement, when virtually everything else had been resolved (*id.*, ¶ ¶ 17-18, at 5).

As expected by Myles, timely completion of that settlement agreement was critical to SLM's survival (*id.*, ¶ 16, at 5). SLM tried to get the Postal Service to relent on this seemingly inconsequential, and wholly unjustified, demand, and tried to negotiate some reasonable, mutually acceptable parameters, that would have allowed Bridwell to continue working for SLM, but isolate her from any involvement in dealing with the Postal Service (*id.*, ¶ 19, at 5-6). However, the Postal Service was inflexible, and SLM was forced to acquiesce and agree to discharge Bridwell (*id.*, ¶¶ 22-23, at 6).

Due to Bridwell's health problems, SLM deferred its intended 30-day termination notice to Bridwell, and did not tell her that the Postal Service was requiring SLM to discharge her until approximately November 22, 2007 (*id.*, ¶ 24, at 7). Bridwell promptly asked the Postal Service to reconsider and withdraw its requirement, or to at least notify her as to the bases therefor so that she could address and respond to the same, and hopefully alleviate the Postal Service's apparent concerns (*see* Cmplt Exh. E). SLM asked Postal Service to allow SLM to continue to employ Bridwell, while Postal Service considered Bridwell's request (Cmplt Exh. D). The Postal Service agreed (Myles Decl. ¶ 27, at 7).

After almost two months, the Postal Service denied the reconsideration request, and required that SLM terminate Bridwell's employment effective no later than February 29, 2008

(*id.*, ¶¶ 28-29). SLM promptly told Bridwell that her employment would be terminated as of February 29, 2008, and confirmed the same by letter dated February 12, 2008 (*id.*, ¶ 31, at 8).

Bridwell subsequently attempted to set up a meeting to resolve this matter, but the Postal Service refused to meet, by communication sent February 19, 2008 (*id.*, ¶ 32, at 8). Bridwell filed this case promptly thereafter, seeking declaratory and injunctive relief against the Postal Service (*id.*, ¶ 33, at 8).

## DISCUSSION

I. **The Postal Service, Not SLM, Is the Real Party in Interest in this Action, and SLM was Merely the Tool Used by the Postal Service to Avoid and By-Pass Constitutional Due Process Requirements Applicable to Direct Postal Service Action.**

SLM, as Bridwell's employer, may be a necessary party to this action. However, the Complaint manifestly makes clear that the gravamen of Bridwell's action is directed against the Postal Service, which forced SLM to discharge Bridwell.

SLM itself did nothing wrong, but rather merely was the tool by which the Postal Service carried out its action against Bridwell.

The Postal Service thus is the real party in interest in this proceeding.

II. **SLM's Acquiescence to the Postal Service's Required Discharge of Bridwell Was the Result of Coercion by the Postal Service, and But for the Postal Service's Insistence, SLM Would Continue Bridwell's Employment.**

As the accompanying Myles Declaration makes clear, SLM was forced to accept the Postal Service's demand that SLM discharge Bridwell in order to save the company (*id.*, ¶¶ 16, 21). Indeed, the Postal Service's January 22, 2008 letter makes this point manifestly clear:

> "The Postal Service believed it wholly appropriate to require that you and SLM Trans, Inc. terminate your employment relationship with Ms. Bridwell. . . . That point was made clear to you in the Postal Service's negotiation of the Settlement Agreement, and, understanding that the Postal Service was not

prepared to enter that agreement unless it provided for Ms. Bridwell's termination [,] you agreed to that provision."

Cmplt Exh. F.

But for the Postal Service's as-yet unexplained, and unjustified insistence, SLM would be willing to continue to employ Bridwell, and views her "as a hardworking, conscientious and totally loyal employee." (Myles Decl. ¶ 35, at 9.)


**III.    However, SLM Would be Irreparably Injured by Any Requirement to Continue Bridwell's Employment Absent the Postal Service's Acquiescence or a Judicial Determination that the Required Discharge by Postal Service Is Unlawful and Unenforceable.**

While SLM would like to continue Bridwell's employment, SLM is bound by its agreement and commitment to the Postal Service, and must discharge Bridwell unless the Postal Service relents or this Court determines that the provision of the Settlement Agreement requiring SLM to fire Bridwell is unlawful and unenforceable, and enjoins the Postal Service from requiring SLM's compliance therewith.

SLM would be irreparably injured were this Court to require SLM to retain Bridwell as an employee without holding the subject Settlement Agreement provision unlawful and unenforceable, as the Postal Service might then consider that SLM breached the Settlement Agreement and seek to nullify the same, putting SLM's future existence at stake.


## CONCLUSION

The Postal Service, not SLM, is the real party in interest in this litigation, and SLM is merely caught in the middle and being used by the Postal Service to accomplish that which the Postal Service cannot do directly without complying with established due process requirements that the Postal Service, for some unexplained reason, has refused to pursue in this instance.

However, SLM requests that the Court carefully consider SLM's interests in this matter in fully satisfying and complying with the terms of the Settlement Agreement so that SLM's continued existence and success are not put at risk.

Respectfully submitted,

/s/   Hopewell H. Darneille III
Hopewell H. Darneille III, Esq.
(D.C. Bar No. 220608)
THOMPSON COBURN LLP
1909 K. Street, N.W. - Suite 600
Washington, DC   20006-1167
(202) 585-6934 (Dir. Tel.)
(202) 585-6969 (Fax)

    /s/   Timothy Sullivan
Timothy Sullivan, Esq. (D.C. Bar No. 224295)
THOMPSON COBURN LLP
1909 K. Street, N.W. - Suite 600
Washington, DC   20006-1167
(202) 585-6930 (Dir. Tel.)
(202) 585-6969 (Fax)

*Attorneys for Defendant SLM Trans, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 11th day of March, 2008, a true and correct copy of the foregoing "Response of SLM Trans, Inc. to Plaintiff's Application for a Preliminary Injunction" and the accompanying "Declaration of Shelly Myles," with the attached Exhibits A-D, were mailed electronically through CM/ECF to:

> Christopher C.S. Manning, Esq.
> MANNING & SOSSAMON, PLLC
> 1120 20th Street, N.W.
> North Building, Suite 700
> Washington, DC  20036
>
> Jeffrey A. Taylor, Esq., U.S. Attorney
> Rudolph Contreras, Esq., Assistant U.S. Attorney
> Harry B. Roback, Esq., Assistant U.S. Attorney
> 555 4th Street, N.W.
> Washington, DC  20530

    /s/    Hopewell H. Darneille III

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|                              |   |                               |
|------------------------------|---|-------------------------------|
| CINDY BRIDWELL,              | ) |                               |
|                              | ) |                               |
| *Plaintiff,*                 | ) |                               |
|                              | ) |                               |
| v.                           | ) | Civil Action No. 1:08-cv-00345 |
|                              | ) |                               |
| SUSAN BROWNELL, et al.,      | ) |                               |
|                              | ) |                               |
| *Defendants*.                | ) |                               |
|                              | ) |                               |

## DECLARATION OF SHELLY MYLES

I, Shelly Myles, an adult resident of Bowie, Prince Georges County, Maryland, being of sound mind and body, hereby declare and state as follows:

1.      I am President and Chief Executive Officer ("CEO"), and the sole owner, of SLM Trans, Inc. ("SLM"), a Maryland corporation with its principal offices at 8401 Corporate Drive, Suite 230, Landover, MD 20785. SLM is a named Defendant in this case as the employer of the Plaintiff, Cindy Bridwell ("Bridwell"). I am submitting this Declaration in support of SLM's response to Ms. Bridwell's Application for a Preliminary Injunction.

2.      I incorporated SLM in the State of Maryland in February 2003, and started operating mail transportation contracts for the United States Postal Service ("Postal Service" or "USPS") starting July 1, 2003. SLM's business consists entirely of transporting mail by truck over Highway Contract Routes ("HCRs") for the Postal Service.

3. SLM has a relatively small administrative staff, consisting of about 12 employees, some of whom are at SLM's corporate offices in Landover, MD, while the balance work in SLM's offices in Sumner, IL.

<u>**Cindy Bridwell**</u>

4. SLM hired Ms. Bridwell in 2005, and continues to employ her today, pursuant to the parties' February 28, 2008 agreement pending the resolution of the pending Application for a Preliminary Injunction. Ms. Bridwell's position is as SLM's Director of State Fuel Taxes. As an interstate trucking company, SLM is required to track and report to the various states through which SLM's trucks operate the number of gallons of diesel fuel purchased by SLM in each state, the number of miles operated by SLM in each state, and the total and allocable fuel taxes paid by SLM. This is a time-consuming, detail intensive, job, and is critical to the successful operation of an interstate trucking company such as SLM.

5. Ms. Bridwell has been employed in the Postal Service mail transportation industry for 19 years, and has a detailed knowledge not only of the industry, but also the fuel tax requirements and responsible personnel in the many states through which SLM operates. Ms. Bridwell has done an outstanding job for SLM, and has successfully passed a number of audits by various of the states through which SLM operates.

6. Ms. Bridwell also has long experience and detailed knowledge with respect to Department of Transportation hours of service rules and driver log requirements, and reviews SLM's daily driver logs for compliance with applicable rules and regulations.

<u>**SLM's Suspension & Proposed Debarment**</u>

7. In late January 2006, I received a copy of a letter to Hal Hicks – my father – from the Postal Service's debarring official. In this letter the Postal Service notified Mr. Hicks that the

Postal Service was suspending and proposing to debar him, as well as an individual named Pam Mason, myself, and by affiliation with me, my company SLM, from doing business with the Postal Service, effective January 26, 2006. A copy of this letter is attached as <u>Exhibit A</u> to this Declaration.

8.     The Postal Service stated that this action was based upon Mr. Hicks' guilty plea to certain violations, including the making of a false "Fuel Use Certification" to the Postal Service in connection with the performance of a mail transportation contract. Conspicuously, the Postal Service did not allege that either I or SLM had done anything wrong, and the Postal Service's suspension and proposed debarment of me and SLM was based solely upon a perceived affiliation between Hicks and myself.

9.     Importantly, in the context of the present case, Ms. Bridwell was not mentioned in the Postal Service's January 25, 2006 letter, although it was subsequently revealed that the Postal Service Office of Inspector General ("OIG") had interviewed her several years earlier during the course of the OIG's four-plus year investigation into the facts of alleged wrongdoing by Mr. Hicks and Midwest Transit, Inc.

10.     Moreover, the OIG's subsequently-provided Report of Investigation in Case # 01HI104B1000, entitled "Midwest Transit, Inc.," which was forwarded to the then Postal Service debarring official, Mr. Keith Strange, by OIG letter dated November 8, 2005, similarly did not assert any wrongdoing by Ms. Bridwell. Thus, while the OIG recommended, at the conclusion of its four-year investigation, that the Postal Service debarring official consider suspension and debarments for three individuals and seven different businesses, the OIG conspicuously did ***not*** recommend that Ms. Bridwell be suspended and debarred.

11.     This is not surprising, since a summary of the OIG's July 24, 2002 interview of Janie Ensminger reveals that the OIG was advised more than three years earlier that Ms. "Bridwell is *not* a Hal Hicks sympathizer" (*see* <u>Cmplt Exh. B</u>, at pg. 1; emphasis added). Indeed, while the court-appointed receiver operating Midwest Transit fired all of the individuals perceived, by the people who knew them best over a period of many years, as "Hicks sympathizers," Ms. Bridwell was *not* fired and was allowed to continue to work for Midwest Transit (*id.*, at pg. 2).

12.     Ms. Mason and Mr. Hicks subsequently were each debarred by the Postal Service for three-year periods, commencing in late March and late September 2006 respectively.

13.     SLM and I challenged the Postal Service's suspension and proposed debarment in extended proceedings, which dragged out over the next 16 months. During this extended time period SLM and I could not bid on new contracts, and several then SLM contracts were allowed by the Postal Service to expire, without renewal. This suspension, and resultant loss of business, caused substantial financial hardship to SLM.

14.     During the suspension and proposed debarment proceedings, the Postal Service posed detailed questions to SLM, and SLM submitted extensive documentation, including a list of all SLM employees, including Ms. Bridwell. At no time during this extensive exchange did the Postal Service raise any concerns as to Ms. Bridwell's employment at SLM.

## SLM's Settlement with the Postal Service

15.     In February-March 2007, the Postal Service on the one hand, and SLM and I on the other hand, negotiated a proposed settlement of the suspension and proposed debarment of SLM and myself. By early April 2007, the parties had exchanged draft documents and reached agreement on essentially all issues.

4699242.3                              - 4 -

16.    At that point, time was of the utmost importance in completing the proposed settlement, because SLM had a number of contracts, involving some $8 Million in annual revenues, that were scheduled to expire on June 30, 2006, and which could not be extended without a resolution of the ongoing suspension. The loss of the expiring contracts, and the continuing inability to compete for and obtain new work, would have forced SLM and me out of business and into bankruptcy.

17.    On April 4, 2007, the Postal Service raised Ms. Bridwell's name for the first time, and stated that, "if she is currently on the payroll, we would expect her to leave the payroll no later than 6 weeks after the agreement's effective date." *See* E-Mail from W. Jones to SLM's Counsel, Hopewell Darneille, dated April 4, 2007, a copy of which is set forth as Exhibit B to this Declaration.

18.    I was shocked and perplexed by this new demand, out-of-the-blue, by the Postal Service. SLM inquired as to the bases for this demand, and basically got nothing other than the generalized statements (1) that Ms. Bridwell had been interviewed by the OIG several years earlier, and (2) that Ms. Bridwell was viewed as being the equivalent of an unnamed co-conspirator in Hicks' fuel schemes. The latter does not appear to be confirmed by the OIG's report of its four-plus year investigation into such matter. In any event, at no time has the Postal Service ever initiated any proceedings against Ms. Bridwell, nor, to my knowledge, has her name arisen in any pleadings filed in any of the many litigation matters relating to Hicks, Midwest Transit and its successor Midwest Transport, Inc. (*see, e.g.,* Complaint Exh. A).

19.    I requested that the Postal Service withdraw this new demand, and sought to find some mutually acceptable resolution through limitations on Ms. Bridwell's activities for SLM. I pointed out that Ms. Bridwell is primarily involved with state fuel taxes allocation and DOT

driver logs, neither of which impacts any Postal Service interests. I also pointed out that, unlike Mr. Hicks, Ms. Mason and myself, Ms. Bridwell had not been provided notice of, or any opportunity to respond to, the Postal Service's apparent concerns, and that I thought that it was fundamentally unfair to her for the Postal Service to require SLM to fire her without appropriate due process procedures. *See* E-Mail from SLM Counsel to USPS/W. Jones, dated April 5, 2007, which is attached as <u>Exhibit C</u> to this Declaration.

20.    The Postal Service summarily rejected my request by e-mail the next day, stating that "Those among [the Postal Service] who are concerned about Ms. Bridwell are not prepared to accept her continued performance for SLM under the settlement agreement." *See* E-Mail from USPS/W. Jones to SLM Counsel, dated April 6, 2007, attached as <u>Exhibit D</u> to this Declaration. The Postal Service was not willing to seek any middle ground on this, and it quickly became clear that the Postal Service would not move forward with the proposed settlement unless I acquiesced on this point.

21.    While I continued to believe that the Postal Service's position was without basis and fundamentally unfair to Ms. Bridwell, SLM and I had no choice in the end but to acquiesce, in order to save the settlement agreement and SLM's ability to survive.

22.    I did, however, manage to persuade the Postal Service to extend the time that Ms. Bridwell could continue working for SLM to six months after the settlement agreement was executed (*see* <u>Cmplt Exh. C</u>, Art. 6.B.8, at pg. 4).

23.    The settlement agreement with the Postal Service was executed on May 31, 2007 (*see* <u>Cmplt Exh. C</u>, at pg. 13). This means that I was required to discharge Ms. Bridwell by no later than November 30, 2007.

**Cindy Bridwell's Termination Notice & Reconsideration Request to the Postal Service**

24.    I intended to give Ms. Bridwell 30 days notice of her termination.  However, she suffered some serious health problems and was hospitalized several times over a period of several weeks during the first part of November 2007.  I did not think that it was right to compound her concerns about her health and recovery efforts by telling her that I had to fire her. I therefore deferred telling her the bad news until she was well enough to return to work, on or about November 22, 2007.  I told her that, in accordance with the Postal Service's mandate, the termination was effective as of the close of business on November 30, 2007.

25.    Ms. Bridwell advised me that she intended to ask the Postal Service to reconsider the requirement that I fire her, and I understand that she submitted such a request to the Postal Service on or about November 27, 2007 (*see* Cmplt Exh. D).

26.    I submitted a letter supporting her request, and asked the Postal Service to allow SLM to continue to employ Ms. Bridwell pending the Postal Service's decision on Ms. Bridwell's request (*see* Cmplt Exh. E).

27.    The Postal Service granted my request, and authorized me to continue to employ Ms. Bridwell pending further notice.

28.    I did not hear anything further from the Postal Service in this regard until January 23, 2008 – almost two full months later – when I received a letter dated January 22, 2008, signed for a Ms. Paula Garner (Cmplt Exh. F).  Although this letter acknowledged that it was Ms. Bridwell who had requested that the Postal Service reconsider the Postal Service's requirement that SLM terminate Ms. Bridwell's employment, the letter was addressed to me, rather than Ms. Bridwell, and was merely copied to her.

29.    The Postal Service stated that it was unwilling to rescind the requirement that SLM terminate Ms. Bridwell's employment. However, the Postal Service did agree to defer the effective date of the required employment termination until February 29, 2008.

30.    The Postal Service's January 22, 2008 letter makes unequivocally clear the coercion that SLM and I were under, and that we had no choice but to agree to the required employment termination of Ms. Bridwell, if SLM wanted to resolve the suspension and proposed debarment in the Spring of 2007 (*id.*).

### SLM's Termination of Ms. Bridwell's Employment and the Instant Suit

31.    In accordance with the Postal Service's January 22, 2008 letter, I promptly told Ms. Bridwell that SLM was terminating her employment, effective February 29, 2008. I confirmed this verbal advice in a formal employment termination letter to Ms. Bridwell, dated February 12, 2008 (*see* Cmplt Exh. G). I mailed the original of this letter to Ms. Bridwell at her home address, and subsequently faxed a copy thereof to Ms. Bridwell at her request on February 22, 2008, care of her husband's fax.

32.    To my understanding, Ms. Bridwell requested a meeting with the Postal Service to attempt to resolve the underlying issues without the need to resort to litigation. However, the Postal Service denied this request, and refused to meet with Ms. Bridwell, on or about February 19, 2008.

33.    Ms. Bridwell filed the subject lawsuit against the Postal Service and SLM eight days later, requesting declaratory and injunctive relief.

**Irreparable Injury to SLM**

34.    As I stated in my February 12, 2008 employment termination letter to Ms. Bridwell, the only reason that SLM terminated her employment was because the Postal Service made SLM do so (*see* Cmplt Exh. G).

35.    I continue to view Ms. Bridwell as a hardworking, conscientious and totally loyal employee, and SLM absolutely would continue to employ her in her present position were the Postal Service to relent and permit such, or were this Court to determine that the Postal Service's requirement that SLM discharge Ms. Bridwell is unlawful.

36.    However, SLM is entirely dependent upon Postal Service work, and will comply fully with the settlement agreement terms, and could not, and would not, continue to employ Ms. Bridwell unless the Postal Service either withdraws the subject requirement or such is ruled illegal and unenforceable.

37.    Because of SLM's dependence upon Postal Service work, and the role of the settlement agreement in enabling SLM to continue such work, SLM and I would be irreparably injured by any requirement to continue Ms. Bridwell's employment in which the Postal Service does not acquiesce or which is not the result of a judicial determination that the subject provision of the settlement agreement is unlawful and unenforceable as to Ms. Bridwell.

**Mrs. Bridwell's Ability to Obtain Alternative, Comparable, Work**

38.    I grew up in Southern Illinois, and have had an office in Olney, Illinois, and now Sumner, Illinois, for several years.   I therefore am familiar with the economically-depressed business conditions and extremely unfavorable job market for jobseekers that exists in that area.

39.    Based thereon, and considering Ms. Bridwell's lack of a college degree, I believe that it will be extremely difficult for her to get a comparable job with anyone in the surrounding

area that will pay her anything close to what she is making at SLM. This is so, even absent the very considerable dark cloud that the Postal Service has cast upon her reputation by associating her with criminal activity and requiring her discharge. That cloud, however, will make her task of finding comparable employment even more challenging.

40.     Moreover, I believe it will be virtually impossible for her to find a job anywhere with another mail contractor – the industry in which she has spent her entire working life. This is because the Postal mail transportation industry is a small industry, in which news travels very quickly. Other contractors will be extremely reluctant to hire Ms. Bridwell once they learn that the Postal Service has associated her with criminal activity and required SLM to discharge her.

41.     In this regard, and as you can imagine, truck drivers have little to do while driving other than talk, and they do a lot of that. Moreover, the industry, as a whole, engages in the same thing. I recall being surprised that virtually everyone in the industry knew that SLM and I had been suspended almost as soon as I received notice thereof. This was a major topic of conversation at a National Star Route Mail Contractors Association meeting held only weeks later, despite the lack of any public announcement of such action by the Postal Service or any press coverage thereof.

42.     The high visibility and notoriety that has been accorded to Hicks' conviction and the recently-filed False Claims Act case (*see* Cmplt Exh. A), and a related Postal Service Board of Contract Appeals case, both involving Midwest Transport, Inc., will assure industry's continued attention to the instant case and the Postal Service's unusual action against Ms. Bridwell.

43.     The Postal Service's vendetta against Ms. Bridwell is even more curious given that no action has yet been taken to suspend or debar, or otherwise require the employment

discharge of, her superiors at Midwest Transit, who now stand charged with direct, and far more egregious and substantial, fraud against the Postal Service involving more than $1 Million (*see* Cmplt Exh. A).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in St. Louis, Missouri, this 11th day of March, 2008.

Shelly Myles

Attmts 4 – Exhs A - D

EXH. A

KEITH STRANGE
VICE PRESIDENT, SUPPLY MANAGEMENT

 **UNITED STATES
POSTAL SERVICE**

**CERTIFIED MAIL
RETURN RECEIPT REQUESTED**

January 25, 2006

Mr. Hal D. Hicks
2425 S. Atlantic Avenue PH5
Daytona Beach, FL 32118-5432

Dear Mr. Hicks:

The United States Postal Service (USPS) is immediately suspending you and proposing your
debarment both pursuant to Title 39, Code of Federal Regulations (CFR), Section 601.113 (as
revised effective May 19, 2005, copy enclosed), for your pleas of guilt as to criminal offenses
involving the making of false statements, including one instance of making a false statement
involving the performance of a government contract.

Specifically, on January 12, 2006, before a District Judge of the Southern District of Illinois, you
entered a guilty plea as to willful and knowingly making a false, fictitious, and fraudulent
statement, in that you falsified a "Fuel Use Certification" submitted to the USPS in connection with
the performance of a mail transportation contract, in violation of Title 18, United States Code,
Sections 1001 and 1002, and the willful and knowing subscription of an Internal Revenue Service
form 1040, filed with the IRS, which was false as to a material matter, in violation of Title 26,
United States Code, Section 7206(1).

Further, on September 30, 2005, the United States of America, plaintiff, filed against you and
HHMT, Inc., a corporation which you controlled, a civil complaint asserting causes of action under
the False Claims Act, seeking treble damages and civil penalties against you in the amounts of
$168,036 and $2,475,000, respectively, and treble damages and civil penalties against HHMT,
Inc. (jointly with you) in the amounts of $119,524 and $1,485,000, respectively, all arising out of
the submission of false claims, statements, and certifications in connection with the performance
of mail transportation contracts held with the USPS. (The fuel use certification the making of
which you have plead guilty to was similarly with respect to a contract held by HHMT, Inc.)
Because HHMT, Inc., is currently no longer extant as a entity, the Postal Service is not proposing
to take any action against it, notwithstanding that the referenced civil complaint provides a basis
for such action. However, as discussed below, certain directors of HHMT, Inc., are hereby
suspended and proposed for debarment.

39 CFR 601.113(e) provides, in relevant part:

The criminal, fraudulent, or improper conduct of an individual may be imputed to the firm
with which he or she is or has been connected when an impropriety was committed.
Likewise, when a firm is involved in criminal, fraudulent, or other improper conduct, any
person who participated in, knew of, or had reason to know of the impropriety may be
debarred.

And 39 CFR 601.113(e) and (i) provides that an affiliate of a debarred or suspended supplier (that
is, "[a] business, organization, person, or individual connected by the fact that one controls or has
the power to control the other or by the fact that a third party controls or has the power to control
both") may be included in a debarment or suspension.

475 L'ENFANT PLAZA SW
WASHINGTON DC 20260-6200
202-268-4040
FAX: 202-268-2795

2

The Postal Service has identified the following individuals as persons connected with you to whom your criminal conduct may be imputed, and/or as your affiliates, and, accordingly, each of them and their named affiliates are hereby included within the scope of this suspension and proposed debarment:

Shelly Lynn Myles (Chairman of the Directors of HHMT, Inc. during the time that you submitted false claims on its behalf, individually and d/b/a SLM Transportation, a sole proprietorship, and SLM Trans, Inc., a Maryland corporation, an affiliate of Shelly L. Myles, its President.

Pam Mason (a director of HHMT, Inc., during the time that you submitted false claims on its behalf and whose signature appears on several of false claims submitted on the corporation's behalf as charged in the pending civil complaint against you and the corporation)

You and the above-named individuals and corporation are immediately suspended from contracting or subcontracting with the USPS for a period of one year, beginning January 26, 2006 and will remain in effect until January 26, 2007, unless the suspension is extended or sooner revoked or it is replaced by a debarment. During the period of the suspension, the Postal Service will not solicit proposals from any suspended entity. If such proposals are received, they will not be considered for award unless it is determined by the USPS to be in its interest to do so. Each suspended individual or corporation will be included on the Postal Service's list of debarred or suspended suppliers, and pursuant to 601.113(d)(5), new work (other than work added by service changes under mail transportation contracts) may not be added to existing contracts with those entities. Pursuant to 39 CFR 601.113(k)3., within 30 days of receipt of this notice, any suspended individual or firm may submit to the undersigned, in writing, any information or reason(s) that entity believes makes the suspension inappropriate.

The debarments proposed herein will be for a period of three years and will be effective no sooner than 30 days subsequent to the date of this notice. Pursuant to 39 CFR 601.113(h)1., within 30 days of this notice, any individual or corporation proposed for debarment may submit to the undersigned, in person or in writing, or through a representative, information and argument in opposition to the proposed debarment. In the event an entity does not submit information or argument in opposition to the proposed debarment within the time allowed, the debarment will become final as to it with no further review or appeal.

Sincerely,

Keith Strange

Enclosure

cc: w/enclosure

Ms. Shelly Myles
3300 Almaden Court
Bowie, MD 20716-3852

Ms. Pam Mason
6449 East IL 250
Claremont, IL 62421-2570

SLM Trans, Inc
8401 Corporate Drive, Suite 230
Landover, MD 20785-2267

EXH. B

---

From:       Jones, William J - Washington, DC [william.j.jones@usps.gov]
Sent:       Wednesday, April 04, 2007 2:12 PM
To:         Darneille, Hopewell H., III
Subject:    RE: SLM Susp. & Prop. Debarment - Sttlmt Agmt; Follow-Up Cmts on USPS Proposed Changes.

Hopewell --

I think this should work.  Ms. Brownell is not available today or tomorrow; she will be here Friday, but I am
somewhat doubtful that she will be prepared to complete her review of the agreement by then.  I would assume,
however, that the alternative you suggest, allowing SLM to propose on the solicitations due Monday, subject to
agreement on the terms before award, is possible, and am currently staffing that approach, subject, of course, to
Ms. Brownell's approval on Friday.

As I indicated earlier we were considering, we want to include in the agreement a prohibition on the employment
of (or the acquisition of services from) not only Mr. Theil, but also Pamela Mason and Cindy Bridewell, the latter of
whom when interviewed by the OIG was an SLM employee. If she is currently on the payroll, we would expect her
to leave the payroll no later than 6 weeks after the agreement's effective date.

I will plug all of this into the draft and provide it for your consideration hopefully this afternoon, but in no event later
than tomorrow morning.


WJJones
x3002

-----Original Message-----
From: Darneille, Hopewell H., III [mailto:hdarneille@thompsoncoburn.com]
Sent: Wednesday, April 04, 2007 1:52 PM
To: Jones, William J - Washington, DC
Cc: smyles72@comcast.net
Subject: SLM Susp. & Prop. Debarment - Sttlmt Agmt; Follow-Up Cmts on USPS Proposed Changes.


*Confidential, Competition-Sensitive, Business and Personal Data of SLM Trans, Inc. and Shelly Myles
(jointly, "SLM") Submitted for Evaluation Purposes Only in Connection with the Above-Referenced
Proceeding, and Not to Be Disclosed Outside of USPS Supply Management or the Office of the General
Counsel Without SLM's Prior Express Written Authorization, Including Under the Freedom of Information
Act and the Privacy Act; F.R.E. 408*


Dear Bill:

Confirming our telephone discussion this past Monday, SLM has no objection to your proposed changes
of last Friday to the draft Settlement Agreement, with the following clarifications and the limited
exceptions set forth in Paragraphs 3-5 below:

1.  As discussed, SLM understands and accepts your deletion of proposed Art. 4, and appreciates (1)
your past advice that the cognizant Contracting Officers on SLM's various expiring contracts have been
told to hold up any renewal or replacement actions on the subject contracts pending the resolution of this
matter and further Headquarters direction, and (2) your present commitment that you will ensure prompt

| | |
|---|---|
| From: | Darneille, Hopewell H., III |
| Sent: | Thursday, April 05, 2007 12:08 PM |
| To: | 'Jones, William J - Washington, DC' |
| Cc: | 'smyles72@comcast.net' |
| Subject: | SLM Susp. & Prop. Debarment - Sttlmt Agmt; Rev'd Art. 7.B Language. |
| | |
| Attachments: | Sttlmt_Fuel_insert.pdf; Redline.doc |

*Confidential, Competition-Sensitive, Business and Personal Data of SLM Trans, Inc. and Shelly Myles (jointly, "SLM") Submitted for Evaluation Purposes Only in Connection with the Above-Referenced Proceeding, and Not to Be Disclosed Outside of USPS Supply Management or the Office of the General Counsel Without SLM's Prior Express Written Authorization, Including Under the Freedom of Information Act and the Privacy Act; F.R.E. 408*

Dear Bill:

Pursuant to your request, attached below please find a revised version of the subject clause addressing and hopefully resolving the confusion that you identified. I have restructured and broken into separate sentences the existing text. However, I have not changed anything substantively. I also am attaching a red-line comparison showing the changes, for your convenient reference.

I am continuing to liaison with SLM on the proposed new prohibition, apparently generated from OIG, on SLM's continued employment of Cindy Bridwell. As discussed, SLM would really like reconsideration of this point. Unlike Ms. Mason, Ms. Bridwell never worked for Mr. Hicks in any personal capacity. Moreover, as discussed, she was not viewed by Midwest Transit to be allied or associated with Hicks when MWT fired everyone deemed to be allied or associated with him. Moreover, unlike Ms. Mason, Ms. Bridwell never served as an officer or decision maker of HHMT. Rather, she was, and continues to be a highly qualified functionary, with detailed in-depth knowledge and experience of regulatory regimes outside of Postal in which highway trucking companies operate. While you mentioned concern over the false fuel statements involved in the Hicks case, Ms. Bridwell, to our limited understanding, did not have any decision-making role as to the inclusion of the omitted fuel rebates. I did speak briefly yesterday with Hicks' criminal attorney about Ms. Bridwell's involvement in that case, and he advised that she was not an independent player in that case and had only done what she was told under the belief that such was legally correct. He further stated his understanding, based upon his personal review of her statements, that she had cooperated fully with, and been very helpful, to OIG when interviewed. In any event, as you yourself pointed out during earlier discussions on other topics, such fuel statements are not even being used anymore, and have been replaced by other Postal procedures, including Voyageur and automatic economic price adjustment provisions.

In order to address your stated concerns, SLM would like to proposed a compromise along the following lines. SLM would be willing to exclude Ms. Bridwell from work on or any interface with or submissions to Postal, including in connection with any future Postal fuel issues, contract price adjustments or claims, and would be willing to limit her work in any way acceptable to the Postal Service, including having her sign an appropriate statement, satisfactory to the Postal Service, acknowledging such limitations and committing that she would not do anything else. Importantly, Ms. Bridwell is not involved in SLM's management or corporate decision-making.

As discussed, her work on (1) SLM's regularly required IFTA filings, which go to some 25-30 different states every quarter (requiring knowledge of and familiarity with each separate state's requirements), and (2) DOT compliance, is critical to SLM. In the latter regard, Ms. Bridwell has unique knowledge and familiarity with driver logs and the applicable DOT requirements, and is SLM's point person for DOT compliance. As the Postal Service is aware, SLM has successfully passed *several* detailed DOT compliance *audits*, and Ms. Bridwell has been a critical person in SLM's successful compliance. Ms. Bridwell also has personally successfully handled a number of state IFTA compliance audits.

Contrary to your stated expectations, there is no one in the vicinity of Olney, IL who would be able to replace Ms. Bridwell's more than 18 years of experience in these two critical areas (and indeed it is extremely rare to find one

1

person anywhere who can handle both of these issues, and, to our understanding, most companies employ two or more separate groups to handle these distinct regulatory regimes). It therefore is highly doubtful that SLM could hire anyone with such experience in this area, and certainly not quickly or for less than several multiples of what SLM is paying Ms. Bridwell. Just to make clear, however, SLM's principal concern is not cost, but rather being able to find anyone with anything close to Ms. Bridwell's experience in these critical areas in any kind of reasonable timeframe (with summer approaching, SLM believes that it would take at least until mid-Fall to hire anyone, and then training time to get even an experienced person familiar with SLM's operations and processes). SLM therefore respectfully requests that the Postal Service reconsider this one proposed limitation, and that the Postal Service allow SLM to continue to employ Ms. Bridwell with whatever limitations the Postal Service deems necessary that would not inhibit her ability to continue her work in these two _non_ Postal Service-related areas.

Please note, finally, that there also is a legal issue of fundamental fairness to Ms. Bridwell. Ms. Myles believes that Ms. Bridwell is an honest, hard-working, conscientious, trust-worthy and loyal employee of SLM. There is no risk that she will share information with Mr. Hicks. Therefore, the affiliation issues driving the rest of this proceeding are _not_ at issue here. And indeed, you have not stated any concern in that regard. To the contrary, you stated that the Postal Service's concern rather is based upon the belief that Ms. Bridwell was a participant in Mr. Hicks' admitted wrongdoing, although she was never named or identified as a target of such case. SLM believes that there is no reason why she should become one more casualty and person to be punished and made to pay for Mr. Hicks' wrongful acts. In this regard, to require Ms. Bridwell's discharge, depriving her of her present employment and placing a dark cloud over her ability to obtain future employment in the only field she knows, because of concerns relating to Mr. Hicks' criminal conduct, raises serious constitutional liberty interest implications. As you no doubt are aware, there was a recent District Court decision in Florida holding that the Postal Service had violated a supplier's liberty interest case by pulling the supplier's Postal Service clearance without prior due process (_Joyce v. Potter_, M.D. Fl. Case No. 5:06-CV-399-Oc-10GRJ, dated 10/16/06). It would appear that the present circumstances are potentially very similar, and the Postal Service might want to avoid a similar risk here. SLM, of course, is concerned that the proposed action could expose SLM to possible suit as well, and force SLM to incur the related legal expenses and costs of defending any such case. Here, Ms. Bridwell has not been notified of the Postal Service's apparent concerns, and certainly she has had no opportunity to be heard or to challenge the same. It seems that if the OIG has concerns about her, then the processes to pursue such are clearly set forth in the Postal Service regulations. Such processes do not include the proposed round-about approach implicating SLM as a party to such action. Of course, the situation as to Ms. Mason is entirely different, since she was formally notified of the Postal Service's concerns, had an opportunity to challenge the same, and has been debarred.

As your revised draft makes clear, we have resolved virtually every issue and, subject to Ms. Brownell's concurrence, are very close to a mutually acceptable resolution. SLM very much appreciates your cooperation in getting us both this far. However, SLM hopes that the Postal Service will bend somewhat and help us find some mutually acceptable resolution to this single remaining issue. I would be happy to come over and meet with you at your convenience to further discuss and resolve this issue.

On a separate note, the only other outstanding issue that we need to resolve is the requested Postal Service direction as to what to do with the two ongoing Hicks contracts (62233 & 62337). You advised that you had referred this to Dwight Young and the cognizant Contracting Officer (Bob Saxton). However, we have heard nothing back, and something needs to be said about this or carved out in the Agreement, so that there can be no argument that, by continuing to perform those contracts for the Postal Service's convenience, SLM is in violation of any of several Agreement provisions about not having other continuing connections to Hicks. As previously advised, SLM is willing to continue performing such contracts if they are novated to SLM, and alternatively certainly has no objection to the Postal Service terminating such contracts. However, SLM does NOT want to continue the present circumstances, particularly in view of the proposed settlement. Please let us know the Postal Service's desires in this regard.

Please call with any questions or comments on the foregoing or the attached revised proposed fuel clause language. I am presently reviewing the forwarded final draft, and will get back to you this p.m. with any final comments. Thank you again for your cooperation and diligent attention to this matter.

Respectfully yours,


Hopewell H. Darneille III

2

EXH. D

---

From:     Jones, William J - Washington, DC [william.j.jones@usps.gov]
Sent:     Friday, April 06, 2007 12:37 PM
To:       Darneille, Hopewell H., III
Subject:  RE: SLM Susp. & Prop. Debarment - Sttlmt Agmt; Rev'd Art. 7.B Language.

Hopewell --

Those among my clients who are concerned about Ms. Bridwell are not prepared to accept her continued performance for SLM under the settlement agreement. To the best of our knowledge, she is an at-will employee and subject to termination as such  If that is not the case, please provide her employment contract for our review.


WJJones
x3002

-----Original Message-----
From: Darneille, Hopewell H., III [mailto:hdarneille@thompsoncoburn.com]
Sent: Thursday, April 05, 2007 12:08 PM
To: Jones, William J - Washington, DC
Cc: smyles72@comcast.net
Subject: SLM Susp. & Prop. Debarment - Sttlmt Agmt; Rev'd Art. 7.B Language.


*Confidential, Competition-Sensitive, Business and Personal Data of SLM Trans, Inc. and Shelly Myles (jointly, "SLM") Submitted for Evaluation Purposes Only in Connection with the Above-Referenced Proceeding, and Not to Be Disclosed Outside of USPS Supply Management or the Office of the General Counsel Without SLM's Prior Express Written Authorization, Including Under the Freedom of Information Act and the Privacy Act; F.R.E. 408*


Dear Bill:

Pursuant to your request, attached below please find a revised version of the subject clause addressing and hopefully resolving the confusion that you identified. I have restructured and broken into separate sentences the existing text. However, I have not changed anything substantively. I also am attaching a red-line comparison showing the changes, for your convenient reference.

I am continuing to liaison with SLM on the proposed new prohibition, apparently generated from OIG, on SLM's continued employment of Cindy Bridwell. As discussed, SLM would really like reconsideration of this point. Unlike Ms. Mason, Ms. Bridwell never worked for Mr. Hicks in any personal capacity. Moreover, as discussed, she was not viewed by Midwest Transit to be allied or associated with Hicks when MWT fired everyone deemed to be allied or associated with him. Moreover, unlike Ms. Mason, Ms. Bridwell never served as an officer or decision maker of HHMT. Rather, she was, and continues to be a highly qualified functionary, with detailed in-depth knowledge and experience of regulatory regimes outside of Postal in which highway trucking companies operate. While you mentioned concern over the false fuel statements involved in the Hicks case, Ms. Bridwell, to our limited understanding, did not have any decision-making role as to the inclusion of the omitted fuel rebates. I did speak briefly yesterday with Hicks' criminal attorney about Ms. Bridwell's involvement in that case, and he advised that she was not an independent player in that case and had only done what she was told under the belief that such was legally correct. He further stated his understanding, based upon his personal review of her statements, that she had cooperated fully with, and been very helpful, to OIG when interviewed. In any event, as you yourself pointed out during earlier discussions on other topics, such fuel statements are not even being

11/28/2007