## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

CINDY BRIDWELL,                                      )
                                                 )
           **Plaintiff**                    )
                                                 )
           **v.**                           )          **Civil A. No. 08-00345 (JR)**
                                                 )
SUSAN BROWNELL et al.,                               )
                                                 )
           **Defendants.**                  )
_____)

### GOVERNMENT DEFENDANTS' RESPONSE TO PLAINTIFF'S
### APPLICATION FOR PRELIMINARY INJUNCTION

The Court should reject plaintiff Cindy Bridwell's attempt to convert her state tort claims into constitutional violations. Plaintiff works for SLM Trans, Inc. ("SLM"), a Postal Service contractor. Pursuant to a settlement agreement between SLM and the Postal Service, SLM agreed to terminate plaintiff's employment. This settlement agreement resolved a formal debarment proceeding against SLM that was based on its close affiliation with Hal D. Hicks, a former contractor who pled guilty to defrauding the Postal Service. In resolving this debarment proceeding, the Postal Service requested that SLM take several steps to separate itself from Mr. Hicks. These steps included SLM's closing joint bank accounts, canceling existing contracts with Hicks, and ceasing to employ individuals who had previously worked for Hicks. Plaintiff, having worked for two of Hicks' companies, was one such individual. SLM voluntarily agreed to these conditions and signed the settlement agreement in May 2007.

Plaintiff now brings this action alleging that her termination is both unlawful and defamatory. But these allegations, at best, give rise to state tort claims; not claims of constitutional deprivations under the Fifth Amendment. Accordingly, as the government defendants (collectively, the "Postal Service") show below, plaintiff has failed to demonstrate

that this Court has jurisdiction.  Moreover, even if the Court concludes that it has jurisdiction,

Bridwell has fallen far short of demonstrating that a preliminary injunction is warranted.

## BACKGROUND

The Postal Service contracts with companies around the country to provide transportation

of mail over specified highway contract routes ("HCRs").  At this time, the Postal Service has

approximately 17,000 HCR contracts with 10,000 different contractors nationwide.  (Witt Decl.

¶ 5.)  In the State of Illinois alone, there are 145 such contractors working on nearly 400 HCR

contracts.  (Id.)  There are also more than a thousand HCR contractors who have expressed

interest in providing the Postal Service with mail transportation services in Illinois.  (Id.)

Contractors may receive reimbursement from the Postal Service for certain fuel costs

associated with transporting mail over the HCRs.  (Ruppel Decl. ¶ 4.)  In order to receive

reimbursement, contractors must submit a Fuel Use Certification that accurately details the

amount of fuel purchased and the cost of the fuel.  (Id.)

In 2001, the Postal Service's Office of Inspector General ("OIG") began investigating

allegations that a contractor named Hal D. Hicks was submitting fraudulent Fuel Use

Certifications.  (Id. ¶ 3.)  Hicks owned and operated Midwest Transit, Inc. ("MWT") and Hal D.

Hicks Mail Transportation, Inc. ("HHMT").  (Id. ¶¶ 3-4.)  The OIG's investigation confirmed

that Hicks, through his companies, was submitting fraudulent Fuel Use Certifications to the

Postal Service.  (Id.)  In particular, MWT and HHMT received significant discounts on fuel they

purchased from Pilot Corporation.  (Id.)  But neither MWT nor HHMT accounted for these

discounts on the Fuel Use Certifications that they submitted to the Postal Service, as they were

required to do.  (Id.)  MWT and HHMT were thus able to defraud the Postal Service into

2

reimbursing them in full for fuel costs for which the companies had already received discounts from Pilot Corporation.  (Id.)

As part of its investigation, the OIG interviewed MWT employees, including Bridwell. The OIG interviewed her on March 5, 2003.  (Id. ¶¶ 8-9.)  According to Bridwell, she had worked for MWT for 14 years and was the mileage supervisor.  (Id. ¶8, Ex. 1.)  Her job responsibilities included inputting fuel purchase data into a computer system and compiling the information used by the company in submitting its fuel certifications.  (Id. ¶¶ 8-9.)  Bridwell told the OIG that either Hicks or Janie Ensminger, another MWT employee, would instruct her to prepare a Fuel Use Certification.  (Id.)  Bridwell would prepare the certifications, but Ensminger would sign them.  (Id.)  At the time she prepared the certifications, Bridwell was aware that MWT received discounts on the fuel that it purchased from Pilot Corporation.  (Id.)  Bridwell explained that she did not account for these rebates because her supervisors did not instruct her to do so.  (Id.)  These supervisors included Pam Mason, who trained Bridwell how to prepare the fuel certifications, Ensminger, and Hicks.[1]  (Id.)

On April 6, 2005, a federal grand jury indicted Hicks on charges of embezzlement of government funds, making false statements, and tax fraud.  (Id. ¶4.)  Hicks pled guilty on January 12, 2006, to making a false statement (for filing a false Fuel Use Certification) and to filing a false tax return.  (Id.)  The Court sentenced Hicks to prison for 18 months.  (Id.)  In addition to this criminal proceeding, the United States filed a civil complaint against Hicks and

---

[1]The OIG interviewed Ensminger in July 2002.  Ensminger noted that "Bridwell is aware of the rebates from Pilot Corporation for the diesel fuel purchases."  (Compl. Ex. B.)  Ensminger also said that Bridwell "is not a Hicks sympathizer."  (Id.)  Bridwell asserts that the latter statement is an OIG conclusion; it is not.  (Compl. ¶ 26.)

HHMT alleging violations of the False Claims Act.  (Id.)

In the summer of 2003, Bridwell left MWT and went to work at Hicks' other company, HHMT.  (Id. ¶11.)  At HHMT, Bridwell continued to help prepare fuel certifications.  (Id. ¶¶ 11-12.)  However, unlike at MWT, **Bridwell personally signed at least three false Fuel Use Certifications while working at HHMT.**  (Id.; Ex. 2.)  Bridwell signed these certifications in the fall of 2004, which is well after the OIG interviewed her.  These certifications specifically note that the "total purchase cost" should not include "discount[s]."  (Id.)  The person signing the forms is also required to certify that "the information is accurate and complete to the best of [her] knowledge."  (Id.)  In each instance, Bridwell personally certified that the forms were accurate and complete despite knowing that they did not account for the discounts HHMT received from Pilot Corporation.  (Id.)

Bridwell fails to mention in her verified complaint or her affidavit that she worked for HHMT.  (Compl. ¶ 10; Bridwell Aff. ¶ 21.)  Bridwell affirmatively states in her affidavit, however, that "I have never been involved in the certification or submission of any fuel reimbursement claims to the Postal Service.  I have merely collected that information at the direction of my superiors so that my superiors could certify the fuel purchase data to the Postal Service."  (Bridwell Aff. ¶ 7.)  Plaintiff further states in her verified complaint that "[i]mportantly, Ms. Bridwell has never herself ever been involved in the certification or submission of any fuel reimbursement claims to the Postal Service.  She has merely collected that information at the direction of her superiors so that her superiors could certify the fuel purchase data to the Postal Service."  (Compl. ¶ 14.)

As part of its investigation, the OIG also examined whether another contractor, SLM,

was submitting false Fuel Use Certifications. SLM is owned and operated by Shelley Lynn Myles ("Myles"), the daughter of Hicks and a former President of HHMT. (Ruppel Decl. ¶ 6.) The OIG determined that Hicks and HHMT were intricately involved in the business operations of SLM. (Id. ¶ 7.) For example, SLM purchased fuel using HHMT's Comdata and Pilot accounts; SLM utilized Hicks's assets as collateral to secure operating loans; SLM and Hicks held joint bank accounts; SLM leased equipment from HHMT; and some employees of HHMT and SLM – including Bridwell – worked simultaneously for both companies. (Id.) Bridwell began working for SLM in April 2005. (Id. ¶ 13.)

On January 25, 2006, the Postal Service informed Hicks, Myles, SLM, and Mason that the agency was instituting debarment proceedings against them. (Id., Ex. 3.) The Postal Service's proposed debarment of SLM was based on the close connection between Hicks (including HHMT) and the company. (Id.) The Postal Service believed that it was imperative for SLM to be independent from Hicks and HHMT. (Id.) The Postal Service subsequently debarred Hicks and Mason. (Id. ¶ 15.)

SLM and Myles, however, were able to persuade the Postal Service not to debar them. After the Postal Service instituted a debarment proceeding against it, SLM took several steps to separate its ties with Hicks and HHMT. (Compl., Ex. C.) These steps included, among other things, terminating Hicks's consulting role with the company; paying off cash advances made by Hicks; terminating all contractual agreements with HHMT; and closing all joint bank accounts with Hicks. (Id. at 3.) In addition, as part of settling the debarment proceeding against it, SLM agreed to take further action to separate itself from Hicks and HHMT. (Id. at 3-5.) These actions included, among other things, (1) barring Hicks from its facilities; (2) refusing any funds

from Hicks; (3) declining to purchase any property or equipment from Hicks or HHMT; (4)

ceasing to use any credit cards issued by Hicks; (5) paying off remaining loans from Hicks; and

(6) ceasing to employ, or engage the services of, individuals identified by the Postal Service

within six months. (Id.) The Postal Service identified Bridwell and Mason as employees that

SLM should not employ based on their prior work for Hicks and their involvement in the fuel

use certification process. (Ruppel Decl. ¶ 15.) The Postal Service and SLM executed the

Settlement Agreement on May 30, 2007. (Compl. Ex. C at 13.) At that time, Bridwell was the

only HHMT employee who also worked at SLM with responsibilities relating to the submission

of Fuel Use Certifications. (Ruppel Decl. ¶15.)

On November 27, 2007 – just three days before her termination was scheduled to take

effect – Bridwell wrote the Postal Service asking that it permit her to continue working for SLM.

(Compl., Ex. E.) On November 29, 2007, the day before the termination was scheduled to take

effect, Myles wrote the Postal Service requesting that it permit Bridwell to continue working at

SLM. (Compl., Ex. D.)

On January 22, 2008, the Postal Service responded to the letters. (Id., Ex. F.) The Postal

Service denied the request, stating that "a major objective of the Settlement Agreement . . . was

to separate [SLM] from the actions and influences of [Hicks] by eliminating, to the greatest

degree possible, his involvement with [SLM]. (Id.) In that regard, the Postal Service believed it

wholly appropriate to require that [SLM] terminate [its] employment relationship with Ms.

Bridwell, a former employee of Hicks." (Id.) However, the Postal Service granted SLM an

extension until February 29, 2008 to cease employing Bridwell. (Id.)

On February 12, 2008, SLM informed Bridwell by letter that she would be terminated on

6

February 29.  (Compl., Ex. G.)  On February 27, 2008, Bridwell filed the instant action seeking a temporary restraining order and preliminary injunction.  (Compl. At 18-19.)  She contends that the Postal Service infringed on her substantive and procedural due process rights under the Fifth Amendment and that the agency unlawfully debarred her.  (Id.)  Bridwell further alleges that SLM wrongfully terminated her employment.  (Id.)

## ARGUMENT

The grant of a preliminary injunction is a drastic and unusual judicial measure.  Marine Transport Lines, Inc. v. Lehman, 623 F. Supp. 330, 334 (D.D.C. 1985).  "[T]he party seeking injunctive relief bears a substantial burden to show that the party is entitled to such an extraordinary remedy."  Competitive Enterprises Institute, Inc. v. United States Department of Agriculture, 954 F. Supp. 265, 269 (D.D.C. 1996).  Preliminary injunctive relief is rarely appropriate in employment termination cases.  Sampson v. Murray, 415 U.S. 61, 91-92 (1974).

Issuance of a preliminary injunction is appropriate only if the plaintiff clearly demonstrates that: (1) she has a substantial likelihood of succeeding on the merits; (2) she will suffer irreparable harm if the injunction is not granted; (3) other interested parties will not suffer substantial harm if the injunction is granted; and (4) the public interest will be furthered by the injunction.  Serono Laboratories, Inc. v. Shalala, 158 F.3d 1313, 1317-18, 1325 (D.C. Cir. 1998); see also Virginia Petroleum Jobbers Ass'n v. Federal Power Commission, 259 F.2d 921, 925 (D.C. Cir. 1958).

As a preliminary matter, the plaintiff has not shown that the Court has jurisdiction over this matter.  Therefore, it should dismiss plaintiff's complaint with prejudice before addressing the merits of her claims.  Moreover, even if the Court determines that it has jurisdiction,

Bridwell has failed to show that preliminary injunctive relief is appropriate. Specifically, the plaintiff will almost certainly fail on the merits of her due process and debarment claims; the public and the Postal Service have a strong interest in ensuring that SLM and the remnants of Hicks' companies remain separated; and plaintiff will not suffer irreparable harm if she is terminated from SLM.

## I.    PLAINTIFF HAS FAILED TO SHOW THAT THIS COURT HAS JURISDICTION

Before requesting any relief from this Court, Bridwell must demonstrate that the Court has jurisdiction over her claims. See, e.g., Tavoulareas v. Comnas, 720 F.2d 192, 195 (D.C. Cir. 1983). Thus far, she has failed to make this showing. Indeed, plaintiff struggles mightily to convert her state tort claims of defamation and interference with contractual relations into constitutional violations. See Compl. ¶¶ 52-62. But tort claims against the Postal Service must be brought under the Federal Tort Claims Act ("FTCA").[2] See 39 U.S.C. § 409©. And the FTCA has explicitly exempted claims against the United States and its agencies "arising out of . . . libel, slander, . . . or interference with contract rights." See 28 U.S.C. § 2680(h).

Moreover, plaintiff may be seeking review of the Postal Service's actions under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq. But Congress has, with limited exceptions that are not applicable here, specifically exempted the Postal Service from the APA. See 39 U.S.C. §§ 410(a), 410(b); Carlin v. McKean, 823 F.2d 620, 622 (D.C. Cir. 1987) ("Apart

---

[2]  The Complaint names a Postal Service Vice President and the Postmaster General as defendants in their official capacity. (Compl. ¶2.) However, actions against government officials in their official capacities are treated as actions against the agency that employs them. See, e.g., F.D.I.C. v. Meyer, 510 U.S. 471, 484-85 (1994); Hafer v. Melo, 502 U.S. 21, 25 (1991). Thus, the foregoing analysis applies with equal force to these defendants.

from two limited exceptions, the APA is not applicable to the exercise of the powers of the Postal Service."); Morris v. Runyon, 870 F. Supp. 362 (D.D.C. 1994) (noting that "Congress specifically exempted the Postal Service from the [APA].").

Before Bridwell may ask this Court to grant her preliminary injunctive relief, she must demonstrate that this Court has jurisdiction over her claims.

## II.    PLAINTIFF IS LIKELY TO FAIL ON THE MERITS

Even if the Court reaches the merits of Bridwell's claims, she is not likely to prevail in this matter because her claims are without merit.

### A.    Plaintiff's Substantive Due Process Claims Fail As A Matter Of Law

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be deprived of life, liberty, or property without due process of law." U.S. CONST. amend. V. The "substantive" component of the Amendment "provides heightened protection against government interference with certain *fundamental* rights and liberty interests." Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (emphasis added). Examples of fundamental rights include "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." Id. (citations omitted). "The Supreme Court has cautioned against expanding the substantive rights protected by the Due Process Clause[.]" Abigail Alliance For Better Access To Dev. Drugs v. Eschenbach, 495 F.3d 695, 702 (D.C. Cir. 2007) (en banc). Courts accordingly exercise the "utmost care" when considering whether an asserted right is fundamental. Id.

The government may infringe upon a fundamental liberty or property interest only if the infringement is narrowly tailored to serve a compelling government interest. American Fed. Of

<u>Gov't. Empl. v. United States</u>, 330 F.3d 513, 523 (D.C. Cir. 2003).  If the interest is not fundamental, the government's action needs only to be rationally related to a legitimate government interest.  <u>Id.</u>  This deferential standard seeks only to "prevent[] governmental power from being used for purposes of oppression, or abuse of government power that shocks the conscience, or action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests."  <u>Medina v. District of Columbia</u>,, 517 F. Supp.2d 272, 279 (D.D.C. 2007).

Bridwell claims that the Postal Service violated her "substantive due process rights" by requesting that SLM terminate her employment.  (Compl. ¶¶ 58-62.)  Although the plaintiff fails to provide "a careful description of the asserted fundamental liberty interest" in this case, <u>Eschenbach</u>, 495 F.3d at 702, it appears she is claiming that her interest in working at SLM and her reputational interest in not being associated with a convicted felon (Hicks) are fundamental. (<u>Id.</u>)  However, as the Postal Service demonstrates below, neither of these interests satisfies the stringent standard for being a fundamental interest under the Fifth Amendment.

It is well-settled that "[d]efamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation."  <u>Siegert v. Gilley</u>, 500 U.S. 226, 233 (1991).  In <u>Paul v. Davis</u>, 424 U.S. 693, 701 (1976), for example, the plaintiff alleged that his due process rights were violated when a police department included his name on a flyer of "active shoplifters."  In rejecting the plaintiff's due process claim, the Supreme Court held that "[t]he words 'liberty' and 'property' as used in the [Constitution] do not in terms single out reputation as a candidate for special protection over and above other interests that may be protected by state law."  <u>Id.</u>  These cases recognize the sound proposition that a person's interest against having false statements made about herself is not as important as, for example, that person's right to

marry or have children, and therefore it is not a fundamental liberty interest.  Washington, 521

U.S. at 720.[3]  In this case, as in Paul, Bridwell's reputational interest in not being associated with

a criminal activity is not a fundamental right that is subject to substantive due process

protections.  Paul, 424 U.S. at 701.

 The ability to work for a particular employer is also not a sufficiently important interest

to qualify as fundamental under the Fifth Amendment.  Cf. American Fed. Of Gov't Employees,

330 F.3d at 523 ("Neither the Supreme Court nor this court has ever recognized an interest in

public employment as fundamental.").  For example, in McKinney v. Pate, 20 F.3d 1550, 1556

(11th Cir. 1994), the plaintiff alleged that his termination violated his substantive due process

rights.  In concluding that the right to work for a particular employer was not fundamental, the

Eleventh Circuit held that "areas in which substantive rights are created only by state law (as is

the case with tort law and employment law) are not subject to substantive due process protection

under the Due Process Clause[.]" McKinney, 20 F.3d at 1556; see also Nicholas v. Pennsylvania

State Univ., 227 F.3d 133, 142 (3d Cir. 2000) (noting that employment "is a wholly state-created

contract right; it bears little resemblance to other rights and property interests that have been

deemed fundamental under the Constitution.").  Here, Bridwell's ability to continue working for

SLM, like the plaintiffs' ability to continue working for their employers in McKinney and

Nicholas, is a creature of state law and is not a fundamental interest under the Constitution.[4]

---

 [3] In very limited circumstances reputation in conjunction with another liberty or property
interest may give rise to *procedural* protection under the Due Process Clause of the Fifth
Amendment.  Accord Board of Regents v. Roth, 408 U.S. 564, 573-74 (1972).

 [4] In very limited circumstances a person's interest in continued employment may give
rise to *procedural* protection under the Due Process Clause of the Fifth Amendment.  Accord
Roth, 408 U.S. at 573-74.

Because Bridwell has failed to show that the Postal Service infringed upon a fundamental liberty interest, the Postal Service's request that SLM terminate her as part of resolving its own debarment proceeding must be upheld unless the request is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Butera v. District of Columbia, 235 F.3d 637, 651 (D.C. Cir. 2001). See also McManus v. District of Columbia, __ F. Supp.2d __, 2007 WL 4573442, at * 16 (D.D.C. Dec. 31, 2007). Plaintiff falls far short of making such a showing in this case.

The United States has a clear and important interest in ensuring that companies with which it contracts act honestly and fairly in their dealings with the Postal Service. One such contractor, Hal Hicks, did not. Specifically, Hicks submitted false fuel certifications that enabled him effectively to steal money from the Postal Service. (Ruppel Decl. ¶ 4.) In January 2006, Hicks pled guilty to willfully and knowingly making a false, fictitious and fraudulent statement, and he was sentenced to 18 months in prison. (Id.)

The Postal Service subsequently determined that in addition to being affiliated with MWT and HHMT, Hicks was also affiliated with SLM. Hicks' daughter, Myles, owns SLM; SLM uses trailers that formerly were used by Hicks' companies; SLM leases equipment that Hick's former companies used; and SLM employs Bridwell, a former employee of at least two Hicks companies (MWT and HHT). (Id., ¶¶ 7,11-12.) Based on its investigation into SLM, the Postal Service instituted debarment proceedings against the company. As part of the settlement in that matter, SLM agreed to allay the Postal Service's concerns that SLM was still under the control of Hicks. Specifically, the Postal Service requested, and SLM agreed to provide, assurances that the company would separate itself from Hicks to the greatest extent practicable.

This included SLM's termination of Bridwell, a former employee of Hicks who – contrary to her sworn affidavit in this case – personally certified at least three false fuel certifications on behalf of Hicks' HHMT company.  (Id.)  The Postal Service thus had a reasonable basis for requesting that SLM no longer employ Bridwell.  In these circumstances, there is no support for plaintiff's contention that the Postal Service's actions "shock the conscience" in violation of the substantive due process protections afforded by the Constitution.[5]  McManus, 2007 WL 4573442 at * 16.

**B.    Plaintiff's Procedural Due Process Claims Fail As A Matter Of Law**

The Fifth Amendment provides individuals with procedural protections before certain liberty or property interests may be infringed.   Bridwell contends that the Postal Service deprived her of procedural due process by failing to grant her a hearing prior to requesting that SLM terminate her employment.  This claim fails for two reasons.

**1.    Plaintiff Has Not Been Deprived Of A Liberty Or Property Interest Protected By The Fifth Amendment**

Not all deprivations of liberty or property fall within the ambit of the Fifth Amendment's Due Process Clause.  Cf. Roth, 408 U.S. at 564.  "By its terms, the Due Process Clause does not apply unless an individual can show that the government action at issue deprives [her] of an actual interest in life, liberty, or property."  Fried v. Hinson, 78 F.3d 688, 691-92 (D.C. Cir. 1996).  To meet this test, a person must have more than a unilateral expectation to the property at issue; the person must show that she is legally entitled to it.  Id.; Piroglu v. T.R. Coleman, 25

---

[5] Plaintiff claims that there were two other SLM employees who also worked for Hicks that the Postal Service did not request be terminated.  (Compl. ¶ 13.)  But inculpating two co-workers hardly relieves Bridwell of responsibility for her actions.  And even assuming that Bridwell's factual contentions regarding these other employees are correct, the Postal Service was unaware of these two employees' actions (if any) at the time it entered into the settlement agreement, and had no reason to request their termination.  (Ruppel Decl. ¶ 15.)

F.3d 1098, 1104 (D.C. Cir. 1994) ("To establish a property interest, [the plaintiff] must show more than a unilateral expectation that her employment would not be terminated.")

At-will employees – i.e., those employees who may be terminated for any reason – do not have a property interest in continued employment that is protected by the Fifth Amendment.  See Piroglu, 25 F.3d at 1104; Hall v. Ford, 856 F.2d 255, 265 (D.C. Cir. 1988).  For example, in Piroglu, the plaintiff was an at-will employee of the District of Columbia who was terminated based on a positive drug test and was not afforded a hearing.  Piroglu, 25 F.3d at 1100.  In holding that the plaintiff did not have a property interest that was protected by the Fifth Amendment, the D.C. Circuit opined that "those who are terminable at will have no property interest because there is no objective basis for believing that they will continue to be employed indefinitely."  Id. (quotations omitted).

In this case, Bridwell has not alleged that she was anything but an at-will employee.  Nor did SLM ever inform the Postal Service that Bridwell was not an at-will employee.  Illinois, the state in which plaintiff works, fully recognizes the at-will employment doctrine.  See, e.g., Shelton v. Ernst & Young, 143 F. Supp.2d 982, 991 (N.D. Ill. 2001).  Indeed, under Illinois law, an employee "may be terminated for good cause, bad cause, or no cause at all."  Id.; see also Read v. Sheahan, 833 N.E.2d 887, 898 (Ill. Ct. App. 1995).  In these circumstances, Bridwell did not have a protected property interest in continuing her employment at SLM.

The D.C. Circuit has identified two exceptions to this general rule, neither one of which is applicable in this case.  First, if a plaintiff can show that her termination from a single job has a *binding* effect on her ability to obtain future employment, then she is entitled to the procedural protections of the Fifth Amendment.  See Kartseva v. Department of State, 37 F.3d 1524, 1528

(D.C. Cir. 1994); Taylor v. Resolution Trust Corp., 56 F.3d 1497, 1506-1507 (D.C. Cir. 1995).

In Kartseva, a government contractor terminated a Russian translator after the State Department

declared her ineligible to work on its contracts because of "several significant security

concerns." Kartseva, 37 F.3d at 398. The court stated that if "Karsteva can prove that [the State

Department's] action was, in fact, a determination of her legal eligibility to work on future State

[Department] contracts, then she has a cause of action for violation of her due process liberty

interest." Id. at 1528.

    In this case, the Postal Service has not made any determination that precludes Bridwell

from working on Postal Service (or any other government) contracts. (Witt Decl. ¶¶ 3-5.) Nor

has the Postal Service precluded Bridwell from working for any of the 10,000 HCR contractors

nationwide (except for SLM). (Id.) Indeed, Bridwell may freely work on any Postal Service

contract for any Postal Service contractor that she chooses (except for SLM). (Id.) In these

circumstances, the Postal Service has plainly not made a binding determination that forecloses

Bridwell's ability to work on future Postal Service contracts. See Taylor, 56 F.3d at 1506

(rejecting employee's due process claim against RTC because "the agency had taken no action to

formally debar [the employee] or automatically disqualify him from working on any future RTC

contracts[.]"); Old Dominion Dairy Products v. Secretary of Defense, 631 F.2d 953, 955-56

(D.C. Cir. 1980) (contractor had protected interest where formal determination that he "lacked

integrity" would preclude him from being awarded future government contracts.)[6]

---

[6] The cases cited by plaintiff involve situations where the government has made a
determination that formally prevents the plaintiff from working on future contracts. See, e.g.,
Myers & Myers, Inc. v. United States Postal Service, 527 F.2d 1252, 1255 (2d Cir. 1975)
(concluding that contractor had a protected interest where agency determination that it was not
responsible "barred it from consideration for star route contract awards for an indeterminate

The second exception is where a person demonstrates that in conjunction with being terminated, an employee suffers sufficient harm to her reputation or is stigmatized in such a way that she is effectively precluded from pursuing her chosen profession. Trifax Corp. v. District of Columbia, 314 F.3d 641, 644 (D.C. Cir. 2003). Under this "high" standard, a person must show that the government "has seriously affected, if not destroyed, [her] ability to obtain employment in her field." Taylor, 56 F.3d at 1506-07 (noting that the agency's alleged misconduct "must substantially reduce the value of [her] human capital, as it would if [her] skills were highly specialized and rendered largely unmarketable as a result of the agency's acts."). "The principle behind [this rule] is not that particularly aggravated forms of defamation violate the due process clause when committed by public officials, but that dismissal to the accompaniment of serious public charges of misconduct may prevent the employee from obtaining other employment . . . [and] in a word, operate to blacklist him from such employment." Hall, 856 F.2d at 266.

In this case, Bridwell has failed to meet this high standard for several reasons. First, Bridwell has not shown that her termination from SLM has effectively destroyed her ability to work in her chosen field. As noted above, there are approximately 10,000 HCR contractors nationwide, including 145 in Illinois, at which Bridwell can work. The Postal Service has not blacklisted her from working for these contractors. Moreover, SLM's termination letter makes clear that it believes Bridwell "consistently performed at a high level," that she has "been a valued and reliable employee," and a "good friend" to the company. (Compl. Ex. G.) The letter, which is written by the President & CEO of SLM, further states that Bridwell should "not

_____

time."); Art-Metal, U.S.A v. Solomon, 473 F. Supp. 1, 4 (D.D.C. 1978) (GSA suspended contracts with contractor pending investigation).

16

hesitate to call . . . if you have any questions, or if I can provide a reference or otherwise assist in your job search." Id.  In these circumstances, Bridwell has plainly not been blacklisted or otherwise precluded from obtaining future employment.   Hall, 856 F.2d at 266-67 (terminated employee was not entitled to procedural due process when termination letter said that "the decision to terminate [you] does not reflect unfavorably on your performance[.]"); cf. Kartseva, 37 F.3d at 1529 ("If Kartseva has merely lost one position in her profession but is not foreclosed from reentering the field, she has not carried her burden[.]").

Bridwell also fails to meet this standard because the Postal Service has not publicly charged her with, or even asserted that she intentionally engaged in, misconduct.  Plaintiff admits in her complaint that:

- "The individuals named in [the Postal Service's lawsuit against MWT] as having played a part in MWT's . . . allegedly illegal fuel certification process were Hicks, Janie Ensminger, John Elmore and Ken Hohlbaugh." (Compl. ¶ 21.)

- "[T]he Postal Service's Complaint does not reference Ms. Bridwell as playing any part in the allegedly illegal fuel certification process while at MWT and, furthermore, Ms. Bridwell was never even referenced in the Postal Service's Complaint at all."  (Compl. ¶ 23.)

- "The Postal Service's investigation report explicitly states that Bridwell was 'not a Hal Hicks sympathizer' – further indicating her separation from any allegedly illegal schemes or acts undertaken by Hicks or others." (Compl. ¶ 26.)

- "Thus, based on the recorded history of the Postal Service's investigation into MWT and MTI, it was determined by the Postal Service that Hicks, Ensminger, Elmore and Hohlbaugh were the culprits in the companies' alleged fuel certification scheme – and, according to documentation, Bridwell was not criminally or civilly responsible to any degree." (Compl. ¶ 27.)

In addition, the Settlement Agreement between the Postal Service and SLM does not identify

17

Bridwell by name.  (See id. Ex. C.)

Bridwell has thus failed to show that the Postal Service *publicly* defamed her in conjunction with her termination.  See, e.g., Bishop v. Wood, 426 U.S. 341, 349 (1976); Fried, 78 F.3d at 692.  In Bishop, for example, the plaintiff claimed that the reasons for his termination were defamatory.  In rejecting his claim, the Court observed that "the reasons stated to him in private had no different impact on his reputation than if they had been true."  Bishop, 426 U.S. at 349.  The Court further noted that "the truth or falsity of the [employer's] statement determines whether or not his decision to discharge the [plaintiff] was correct or prudent, but neither enhances nor diminishes [his] claim that his constitutionally protected interest in liberty has been diminished."  Id.; see also O'Donnell v. Barry, 148 F.3d 1126, 1140 (D.C. Cir. 1998) (same); Logan v. Department of Veterans Affairs, 357 F.Supp.2d 149, 156 (D.D.C. 2004) (Plaintiff "has offered no information to support her contention that the VA has actually released the Report containing the objectionable information to any of these alleged employers outside the VA, nor has she shown that the VA's actions have interfered with her ability to practice in her chosen field.").  Bridwell's procedural due process claims, like the claims of the plaintiffs in these cases, fail because the Postal Service has not publicly released false information about her.  Id.

### 2.    Plaintiff Was Afforded All The Procedural Protections To Which She Was Entitled.

Even if Bridwell has successfully identified an interest that is protected by the Fifth Amendment, her procedural due process claim fails because the Postal Service gave her all the procedural protections to which she is entitled.  Bridwell contends that the Postal Service should have given her the opportunity to demonstrate that she did not intentionally participate in Hicks' scheme to defraud.  (Compl. ¶¶ 52-57.)  But that is not the reason the Postal Service requested

that SLM terminate Bridwell's employment.  The Postal Service requested that SLM terminate

Bridwell as part of settling **SLM's** own debarment proceeding.  Specifically, the Postal Service

was concerned about the relationship between Hicks (including his former companies) and SLM,

which is owned by his daughter.  The Postal Service wanted SLM to demonstrate that it was an

independent operation by severing, to the extent practicable, ties to Hicks and Hicks' former

companies.  Thus, the Postal Service requested that SLM, among other things, end Hicks'

consulting relationship with SLM; terminate all contracts with Hicks' company HHMT; close all

joint bank accounts with Hicks; cease buying property or equipment from Hicks; and terminate

specifically identified employees who used to work for Hicks.  (Compl. Ex. C.)

The Postal Service requested that SLM terminate Bridwell because (1) Hicks defrauded

the Postal Service by submitting false fuel certifications; (2) The Postal Service was concerned

that SLM's business was intertwined with Hicks; and (3) Bridwell was a former employee of

Hicks who – whether intentionally or not – was involved in helping him prepare fraudulent fuel

certifications.  (Compl. Ex. F.)  It is undisputed that the Postal Service made no formal finding

that Bridwell intentionally submitted fraudulent fuel certifications to the Postal Service, and as

plaintiff herself concedes, the Postal Service never charged her (either criminally or civilly) with

intentionally submitting false fuel certifications.  Nor is there any evidence that the Postal

Service made, let alone published, an informal finding to that effect.  Indeed, as the Postal

Service's January 22, 2008 letter to Ms. Bridwell and SLM states:

> As you may know, my primary concern is to remove risk and consider
> what is in the best interest of the U.S. Postal Service, and a major
> objective of the Settlement Agreement in that regard was to separate
> [SLM] from the actions and influences of your father, Hal D. Hicks, by
> eliminating to the greatest degree possible his involvement with you and
> your corporations dealings with the Postal Service.  In that regard, the

19

> Postal Service believed it wholly appropriate to require that you and SLM Trans, Inc. terminate your employment relationship with Ms. Bridwell, a former employee of Mr. Hicks.

(Compl. Ex. F.)

In this case, a hearing would serve no purpose because the factual basis for the Postal Service's requesting that SLM terminate Bridwell is undisputed. Plaintiff does not dispute that Hicks defrauded the Postal Service by submitting false fuel certifications or that the Postal Service was concerned by Hicks' role in the operation of SLM. Nor does Bridwell dispute that she worked for Hicks – at both MWT and HHMT – in a position that related to the submission of false fuel certifications. These undisputed facts are what led the Postal Service to request that SLM terminate Bridwell's employment, and there is nothing that a hearing would have changed. Accordingly, Bridwell received all the procedural protections to which she was entitled. Codd v. Velger, 429 U.S. 624, 628-29 (1977) (holding that giving a terminated employee the "opportunity to clear his name" is not required when there are no disputed facts); Hall, 856 F.2d at 267 (holding that "[n]othing further would be gained from a name clearing hearing.")

Moreover, the Postal Service did give Bridwell the opportunity to request that she not be terminated. Specifically, Bridwell and SLM wrote to the Postal Service in November 2007. In their letters, they wrote that Bridwell never intentionally submitted a false fuel certification. The Postal Service considered these letters, but concluded that they did not address the reasons why the agency believed that SLM and Bridwell should not work together. On January 22, 2008, the Postal Service sent Bridwell and SLM a letter explaining the basis for its decision.

## C.    Plaintiff's Debarment Claim Fails Because She Was Not Debarred

Bridwell's debarment claim fails for the simple reason that she has not been debarred.

20

(Compl. ¶¶ 63-67.)  Postal Service regulations provide the agency with the power to debar contractors – i.e., exclude them "from contracting and subcontracting for a reasonable, specified period of time[.]"  39 C.F.R. § 601.113.  Debarred contractors are identified in the General Services Administration Excluded Parties List, which ensures that debarred contractors do not work on Postal Service contracts.  (Witt Decl. ¶¶ 2-3.)  Bridwell's name does not appear on this list.  (Id. ¶¶ 4-5.)  Nor is there any Postal Service prohibition on Bridwell's working for any of the 10,000 contractors nationwide (except for SLM) or on any Postal Service contracts.  (Id.)  Thus, the undisputed evidence reflects that the Postal Service has not debarred Bridwell.

Moreover, these facts belie Bridwell's claim that the Postal Service has "effectively de facto debarred" her from working on Postal Service contracts.  (Compl. ¶¶ 64-65.)  Although Bridwell may not work for SLM, she is able to work for every other contractor in the country, and she may work on any Postal Service contract.  (Witt Decl. ¶¶ 4-5.)  This falls far short of, what some courts have called, a de facto debarment.  For example, in Dynamic Aviation v. Department of Interior, 898 F. Supp. at 13, a helicopter pilot challenged what he viewed as a de facto debarment.  The court noted that de facto debarment could occur based on the revocation of "plaintiff's pilot and aviation cards, [which are] the credentials that allowed him to perform government contract work as a licensed pilot."  Id.; See also Myers & Myers, Inc., 527 F.2d at 1255 (noting that agency's finding that contractor was not responsible "barred it from consideration for star route contract awards for an indeterminate time.").  Unlike the plaintiffs in these cases, Bridwell has been and remains able to work on Postal Service and other government

contracts. Indeed, except for SLM, she can work for any other contractor in the country.[7]

>    **D.    Plaintiff's Request For Injunctive Relief Fails Because Of The Unclean Hands Doctrine**

The unclean hands doctrine derives from the equitable maxim that "he who comes into equity must come with clean hands." Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 814 (1945). The doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." Id. "[W]hile equity does not demand that its suitors shall have led blameless lives, as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." Id. at 814-15 (quotation marks and citation omitted).

In this case, Bridwell stated in her verified complaint and her affidavit that she never certified a Fuel Use Certification herself. (Compl. ¶ 10; Bridwell Aff. ¶ 21.) But the documentary evidence reflects that she did *personally* certify, on at least three occasions, Fuel Use Certifications while employed by HHMT. (Ruppel Decl. ¶ 12, Ex. 2.) This misstatement is compounded by the fact that Bridwell failed to acknowledge in her verified complaint or her affidavit that she even worked for HHMT. In these circumstances, the Court should not permit Bridwell to avail herself of its equitable powers, especially this early in the proceedings.

**III.    THE PUBLIC INTEREST AND THE INTERESTS OF THE POSTAL SERVICE FAVOR DENYING A PRELIMINARY INJUNCTION**

The public interest in this case weighs heavily against granting preliminary (or any)

---

[7] The plaintiff alleges that "[a]t the Postal Service's behest, **SLM** wrongfully terminated Ms. Bridwell[.]" (Compl.¶ 69) (emphasis added). Thus, the plaintiff is not asserting that the Postal Service wrongfully terminated her employment. Nor could she. As a factual matter, the Postal Service never employed Bridwell. And as a legal matter, the United States has not waived its sovereign immunity for such a claim by a non-employee. See 28 U.S.C. § 2680(h).

injunctive relief in favor of the plaintiff. The public has a clear and significant interest in ensuring that the Postal Service deals with honest contractors who engage in fair business practices. Dishonest contractors have the ability to inflict substantial monetary and other damage on the Postal Service and the millions of Americans who use its services. For these reasons, contractors who engage in dishonest conduct towards the Postal Service may be subjected to both civil and criminal penalties.

The public interest is served by affording the Postal Service broad discretion to determine the most efficient and effective way of dealing with contractors that it believes are or may be engaging in misconduct. The Postal Service has promulgated regulations that empower the agency to suspend or debar contractors who are engaging in dishonest conduct. This is a vitally important process that protects that agency and the public from dishonest contractors.

In this case, the Postal Service instituted formal debarment proceedings against SLM based, in part, on its close ties with Hicks, another contractor who was convicted of defrauding the Postal Service. As part of settling the debarment proceeding against SLM, the Postal Service requested that SLM sever, to the extent practicable, its ties to Hicks and his former companies, including HHMT. Plaintiff, who worked for two of Hicks' companies and was involved in the fuel certification process for those companies, was one such tie. SLM agreed to this request, and the settlement agreement was signed by the parties in May 2007.

The public interest was served when the Postal Service and SLM settled their debarment proceeding. This Court should stay its hand and not disrupt the terms of that agreement, which has been in effect for nearly a year. Cf. Old Dominion Dairy Products, 631 F.2d at 955-56 ("Government agencies require sufficient latitude to ensure the efficient functioning of agency

operations, and that the imposition of stringent due process requirements on every governmental decision could have devastating effects on the conduct of Government business.")

Bridwell's assertion that the public interest will be served by having her continue to work at SLM ignores the foregoing facts that support the Postal Service's decision to request that SLM terminate her. Bridwell's argument also ignores the fact that, contrary to her sworn statements that she never signed a fuel certification form, she did precisely that on at least three occasions.

## IV.  BRIDWELL WILL NOT SUFFER IRREPARABLE INJURY

Pursuant to the Settlement Agreement, SLM was required to terminate Bridwell on November 30, 2007. But on November 27, 2007, Bridwell asked for and received an extension. On January 22, 2008, the Postal Service granted SLM until February 29, 2008 to terminate Bridwell. Bridwell then waited until February 27, 2008 to file this action and seek injunctive relief. The plaintiff may not wait until the eve of her termination and then claim that she will suffer irreparable injury if immediate injunctive relief is not entered. The plaintiff's failure to seek relief in a timely manner should not cause this Court to exercise its equitable power and issue a preliminary injunction against the Postal Service. If Bridwell thought that her termination from SLM would result in irreparable harm, she should have sought relief well before now.

Moreover, in Sampson, a probationary federal employee challenged her proposed discharge on the grounds that it was not in accordance with proper civil service procedures. Sampson, 415 U.S. at 940. In rejecting the employee's request for preliminary injunctive relief, the Supreme Court concluded that "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." Id. at 90. The harm

24

that Bridwell alleges she will suffer in this wrongful termination case is no different.

## CONCLUSION

For the foregoing reasons, the Postal Service requests that the Court deny plaintiff's

application for a preliminary injunction in this matter.

Respectfully submitted,

_____
JEFFREY A. TAYLOR , D.C. Bar # 498610
United States Attorney

_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

/s/ Harry B. Roback
_____
HARRY B. ROBACK, D.C. Bar # 485145
Assistant United States Attorney
United States Attorneys Office
555 4th Street, N.W.
Washington, D.C. 20530
Tel: 202-616-5309
harry.roback@usdoj.gov

March 11, 2008

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CINDY BRIDWELL,             )
                                      )
        **Plaintiff,**         )
                                        )
        **v.**               )   CA No. 08-00345 (JR)
                                        )
                                        )
SUSAN BROWNELL, et al.    )
                                        )
                                        )
        **Defendants.**     )
_____)

## DECLARATION OF SUSAN A. WITT

1.      My name is Susan A. Witt. I am a Purchasing and Supply Management Policy

Specialist within Supply Management for the United States Postal Service headquarters in

Washington, D.C. I have personal knowledge of the matters set forth in this declaration.

2.      Like other Government agencies, the Postal Service has a procedure for

suspending and debarring suppliers—identifying suppliers who, for some reason or other, are to

be deemed ineligible to enter into procurement contracts with it. In my capacity as a Purchasing

and Supply Management Policy Specialist, in which position I have served since October, 2002,

I coordinate through the office of Vice President, Supply Management, all the actions of the

Postal Service regarding suspension and debarment of suppliers. Typically, I initially receive

information from the Office of Inspector General or Postal Service Contracting Officers

regarding potential subjects for suspension and debarment. I then forward this information to the

Law Department for legal review and a recommendation to the Vice President, Supply

Management, for further action, if any. In the event that the Vice President, Supply Management

1

decides to initiate suspension or debarment proceedings, I prepare the notice of suspension and notice of debarment with concurrence from the Law Department, have it signed by the Vice President, Supply Management, and mail it to the respondent, with copies provided to the Law Department and the originator of the request.  Thereafter, I monitor the proceedings at each stage.

3.    If the respondent does not contest his suspension or debarment, I arrange for his name to be entered on the *General Services Administration Excluded Parties List* which is maintained on a publicly available website, www.epls.gov.  If the respondent contests the suspension or debarment, I arrange for the respondent to submit, in person or in writing, or through a representative, information and argument in opposition to the proposed debarment, as provided in the Postal Service's suspension and debarment regulations at 39 C.F.R. § 601.113. If, after the procedural requirements for debarment have been followed, the Vice President, Supply Management, decides that suspension or debarment is warranted, then I arrange for the suspended or debarred party to be entered on the *General Services Administration Excluded Parties List*.  It is the responsibility of each Postal Service contracting officer to examine the *General Services Administration Excluded Parties List* prior to awarding a contract.

4.    The plaintiff in this case, Cindy Bridwell, is not now nor, to the best of my knowledge, ever has been entered on the *General Services Administration Excluded Parties List*. Since Ms. Bridwell is not suspended or debarred, she is not disqualified from submitting contract proposals in response to any Postal Service solicitation.

5.    Moreover, there is no prohibition that I am aware of that would prevent Ms. Bridwell from seeking employment with any Postal Service Highway Contract Route ("HCR") supplier other than SLM Trans Inc., which, as part of a settlement with the Postal Service with

respect to its proposed debarment, has agreed not to continue her employment.   Currently, the

Postal Service has approximately 17,000 HCR contracts with approximately 10,000 suppliers

nationwide.  Ms. Bridwell is not barred from seeking employment with any HCR supplier, other

than SLM Trans Inc.  I have reviewed a list of the Postal Service's HCR contracts for routes

originating within the state of Illinois.  There are 379 such routes, operated by 145 HCR

suppliers.  I have also reviewed the Postal Service's list of prospective HCR suppliers, listing

53,925 parties, some 1,330 of whom having Illinois addresses, who have expressed interest in

providing the Postal Service with highway mail transportation services.  I am also aware that Ms.

Bridwell's current employer is located outside of Illinois, and there is nothing from the Postal

Service's standpoint that would preclude her from performing services for another non-Illinoisan

postal supplier just as she is doing now.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on March 7, 2008.

Susan A. Witt
Purchasing and Supply Management Policy Specialist
Supply Management
United States Postal Service

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

CINDY BRIDWELL,                         )
                                        )
             Plaintiff,                 )
                                        )
     vs.                                )      Case No. 08-00345 (JR)
                                        )
                                        )
SUSAN BROWNELL, et al.,                 )
                                        )
             Defendants.                )
                                        )

## DECLARATION OF SPECIAL AGENT TRACEY RUPPEL

I, Tracey Ruppel, make the following declaration in lieu of affidavit pursuant to
28 U.S.C. § 1746. I have knowledge of the following facts and, if called as a witness,
would testify as follows:

1.    My name is Tracey Ruppel and I hold the position of Special Agent, U.S. Postal
Service Office of Inspector General ("USPSOIG"), assigned to Indianapolis, Indiana.

2.    I have been a criminal investigator with the Federal government for twelve (12)
years. I became a Special Agent with the USPSOIG in April 2001.

3.    Beginning in 2001, and in the course of my law enforcement duties as a Special
Agent for USPSOIG, I conducted an investigation into allegations that United States Postal
Service ("Postal Service") highway transportation contractor Hal D. Hicks ("Hicks") of
Midwest Transit, Inc. ("MWT"), a nationwide Postal Service highway transportation
contractor, unlawfully diverted bulk fuel purchase rebates/discounts.

4.    The USPSOIG investigation confirmed that Hicks' mail transportation
companies, MWT and Hal D. Hicks Mail Transportation, Inc. ("HHMT"), received fuel

purchase discounts from Pilot Corporation ("Pilot"). Neither company accounted for these discounts in their fuel use certifications submitted to the Postal Service, as required by law. The investigation resulted in Hicks' indictment by a federal grand jury on April 6, 2005, in the Southern District of Illinois, on charges of embezzlement of government funds, false statements, and tax fraud relating to his operation of Postal Service highway transportation contracts. On January 12, 2006, Hicks pled guilty to making a false statement by filing a false fuel certification on a Postal Service contract and filing a false tax return. Hicks was sentenced to 18 months' imprisonment on September 11, 2006. In addition, on September 30, 2005, a civil complaint was filed against Hicks and HHMT in the Southern District of Illinois, alleging violations under the False Claims Act ("Civil Complaint").

5.    MWT was established in Mt. Carmel, Illinois, in 1979. The trucking company exclusively transported mail. In January 2000, the co-owner of MWT, filed a civil lawsuit in Lawrence county Illinois alleging Hicks mismanaged MWT funds. The court removed Hicks from MWT and placed it under the control of an interim receiver in July 2001. After the appointment of the interim receiver for MWT, Hicks and several other former MWT employees operated HHMT out of Olney, Illinois. The business entity underwent several ownership and name changes and operated contracts under several different names.

6.    Shelley Lynn Myles ("Myles") is Hal Hicks' daughter. For a portion of the time that HHMT was in existence, Myles was either its Chairman or President. Subsequently, Myles held various highway transportation contracts herself as a sole proprietor doing business under the name of SLM Transportation. Myles is the President of SLM Trans, Inc., ("SLM"), which was incorporated in Maryland on February 6, 2003. SLM holds several postal highway transportation contracts.

7.    Subsequently, Hicks became substantially involved with SLM . Investigation revealed the interconnected nature of Hicks/HHMT and SLM. For example, 1) SLM purportedly leased and ultimately purchased trailers from HHMT, although the financial records revealed that a greater amount of funds were transferred to Hicks/HHMT long after the date of the lease and sale transactions; 2) SLM purchased their fuel using HHMT's Comdata and Pilot accounts, and SLM's Pilot fuel purchases generated discounts on HHMT's Pilot account; 3) SLM utilized collateral and/or the co-signature of Hicks to secure operating loans, joint bank accounts and property leases; and 4) several employees performed duties for HHMT and SLM at the same time. These facts served as part of the basis for USPSOIG's Suspension/Debarment referral to the Postal Service in November 2005.

8.    Cindy Bridwell ("Bridwell") began working for Hicks at MWT in approximately 1989. Bridwell was the Mileage Supervisor at MWT's main office in Sumner, Illinois. As the Mileage Supervisor, Bridwell's duties included the input of fuel purchase data into MWT's database system and maintenance of all fuel purchase receipts. She was also responsible for compiling the information used for the fuel use certifications ("Fuel Use Certifications") necessary for the Postal Service contracts.

9.    In connection with the USPSOIG investigation of Hicks and MWT, I conducted an interview of Bridwell on March 5, 2003 (while she was employed by MWT). During her interview, I questioned Bridwell about her role in the preparation of Fuel Use Certifications for MWT, and specifically about the Pilot fuel purchase discounts. Bridwell stated that she was aware of the Pilot fuel rebate program. I specifically asked Bridwell why those discounts were not included on the Fuel Use Certification forms submitted to the Postal Service. Bridwell responded by stating that she learned how to prepare the Fuel Use

Certifications from MWT employee Pam Mason. A copy of the Activity Report memorializing Bridwell's interview is attached as Exhibit 1 to this Declaration.

10. Pam Mason ("Mason") worked at MWT until August 3, 2001, at which time the court-appointed receiver for MWT terminated Mason's employment. Thereafter, Mason went to work for HHMT and subsequently became its president. On February 5-6, 2004, I conducted an interview of Mason during which she acknowledged that she signed and submitted Fuel Use Certifications to the Postal Service, on behalf of HHMT, which did not account for the Pilot discounts.

11. Subsequent to Bridwell's interview, Bridwell left MWT and went to work for HHMT in approximately May-June 2003 and continued to work in the mileage area. Bridwell worked under Mason at HHMT.

12. Further, while working for HHMT in October and November 2004, Bridwell signed and submitted to the Postal Service at least three (3) false Fuel Use Certifications on behalf of HHMT, which failed to account for Pilot discounts. Those certifications, two relating to Contract No. 98010, dated October 22, 2004 and November 15, 2004, and one relating to Contract 752JE, dated October 22, 2004, are attached as Exhibit 2 to this Declaration. The certifications failed to account for the Pilot fuel purchase discounts.

13. In addition, both Mason and Bridwell simultaneously performed work for SLM and HHMT. According to company records, SLM hired Bridwell on April 5, 2005 and hired Mason on October 12, 2005. However, in her 2004 interview, Mason admitted that she prepared SLM's bids for Postal Service contracts while she was president of HHMT. Bridwell also signed and submitted to the Postal Service HHMT's request to terminate Postal Service Contract No. 98010, on August 8, 2005, while she was employed by SLM.

14.  In November 2005, the OIG submitted to the Postal Service's Vice President, Supply Management, a report recommending that the Postal Service consider suspending Hicks from Postal contracting by reason of his indictment for making a false statement involving the performance of a government contract. The report identified SLM and Myles as "affiliates" of Hicks within the meaning of the Postal Service's regulation governing suspension and debarment.

15.  The USPSOIG investigation disclosed that Cindy Bridwell was one of four (4) persons who a) occupied positions at MWT and HHMT, and b) was actively involved in the submission of fuel use certifications to the Postal Service on behalf of those companies. The others were Hal Hicks, Pam Mason and Neva Jane Ensminger. Ensminger was never employed by SLM, and Hicks and Mason were both debarred by the Postal Service in 2006. *See* Letter of Jan. 25, 2006 & Letter of Sept. 29, 2006, attached as Exhibit 3 to this Declaration. I communicated those facts to the Postal Service when the Postal Service was working on the settlement agreement with SLM to try to sever connections between SLM and Hicks.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 10th day of March, 2008.

TRACEY RUPPEL
Special Agent

- 5 -



# UNITED STATES POSTAL SERVICE
# OFFICE OF INSPECTOR GENERAL
77 WEST PORT PLAZA
ST. LOUIS, MO 63146-3124

**DATE: March 10, 2003**

**PREPARED BY: SA TRACEY RUPPEL**

**CASE #: 01HI104BI000**

**CROSS REFERENCE #:**

**TITLE: MIDWEST TRANSIT, INC.**

**CASE AGENT (if different from prepared by):**

### ACTIVITY REPORT - INTERVIEW

**DATE OF INTERVIEW:** March 5, 2003

**PERSON INTERVIEWED:** CINDY BRIDWELL

**LOCATION OF INTERVIEW:** MIDWEST TRANSIT, INC., SUMNER, IL

**INTERVIEWED BY:** SA TRACEY RUPPEL AND SA CHRIS ALBERS

**WITNESSES:** Attorney John Elmore

---

Midwest Transit, Inc. (MWT) employee Cindy Bridwell, RR3, Box 80, Sumner, IL 62466-9311, provided the following information during an interview on the above date:

Bridwell has worked for MWT the past fourteen years. She is the mileage supervisor in the MWT main office in Sumner, IL. Her duties mainly involve the input of the fuel purchase data into their database system, which captures the various state taxes. As she maintains all the fuel purchase receipts, Bridwell is also tasked with compiling the information used for the fuel certifications necessary for the United States Postal Service (Postal Service) contracts. Pam Mason trained Bridwell in her job duties.

Bridwell was instructed by either Hal Hicks or Janie Ensminger when to compile the data for fuel certifications. When instructed, Bridwell pulled all the fuel receipts for a particular contract route for a twenty-eight day

Page 1

RESTRICTED INFORMATION | This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

Exhibit 1

period. The total gallons purchased and the price per gallon on the receipt were added up and then averaged to produce the average price per gallon. Bridwell completed the Fuel Use Certification form, which was created by a computer consultant for MWT. Copies of the fuel purchase receipts were attached to the Fuel Use Certification and sent to Ensminger in the MWT Mt. Carmel, IL office. Ensminger reviewed the documentation, signed the form, and submitted the package to the Postal Service.

Bridwell never negotiated any fuel rebate checks for MWT. She has never conducted any banking transactions for MWT.

Bridwell is aware of the Pilot fuel rebate program. She thought the rebate program was an incentive for MWT to pay the fuel bills in a timely manner. Bridwell noted that some fuel discounts are reflected on Pilot purchase receipts, such as the purchases within Michigan. In such cases, Bridwell uses the price after the discount to determine the price per gallon. Bridwell did not know when or if the rebate checks were ever figured into the amount to be reimbursed by the Postal Service. In her calculations, Bridwell did not account for the rebate amount, as she utilized the purchase receipts for the Fuel Use Certifications. Bridwell acknowledged the areas on the Fuel Use Certification form, which concern discounts; but, as she was never informed to enter anything in those sections, she left them blank.

Bridwell only learned of the fuel rebate program through her conversations with Pilot representatives Wendy Hamilton or Scott Wombold. Since Bridwell is listed as the MWT's fuel manager, Pilot occasionally contacted her when MWT was behind in paying the fuel bills. Bridwell has never spoken with any MWT employees about the fuel rebate program. She has never seen a Pilot rebate check. A few times she received envelopes in her in-box from Pilot. Her name was on the address. Bridwell took the unopened envelopes to Chris Ulrich for proper handling.

Page 2

RESTRICTED INFORMATION          This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

# FUEL STATEMENT FOR CONTRACT NO. _752QE_

**A.**   Complete the shaded areas as applicable:

**NOTE: TYPE OF FUEL PURCHASED MUST BE SELF SERVICE, WHENEVER AVAILABLE, AND IN ACCORDANCE WITH YOUR CONTRACT'S FUEL PURCHASE PLAN.**

1. PLAN TYPE OF PURCHASE MADE:

( · )   Wholesale
(X)    Retail-Commercial
( )    Retail-Supplier Owned

2. TYPE OF FUEL PURCHASED:

(X .)   Diesel
( )    Unleaded             ( . )   Regular
( )    Unleaded Plus        ( . )   Propane
( )    Supreme Unleaded     ( . )   Gasohol
                            ( . )   Other _____

**B.**   Fuel Purchase Information (check appropriate type of purchase):

(X)  .  Daily Purchases - list purchases following instructions on reverse side of this statement.
( . )   Bulk Purchase - complete information below
( . )   Monthly Billing Purchase - complete information below

| Date of Bulk Purchase or Invoice Date | No. of Gallons | Purchased from (station or dealer) | Cost Per Gallon | Total Cost |
|---|---|---|---|---|
| | | | | |
| Total Gallons: | | | Total Cost: | |

**C.**   Certification dates - 28 calendar day period covering _09/04/04_ through _10/01/04_

**D.**   Computation:

Total purchase cost / Total gallons purchased = Rate per gallon

(1) _10,844.80_ / (2) _5805.183_ = $ _1.8681_
(minus discount)

(Number of gallons from PS 7463)  X  _140,249.10_

Requested annual cost to enter in column II = $ _261,999.34_

---

**CONTRACTING OFFICE USE ONLY**

Invoices verified by:

Effective Date:

Allowable Rate:

---

**NOTE: ACTUAL RECEIPTS OR COPIES MUST BE INCLUDED WITH THIS FORM.**

The supplier MUST notify the Contracting Officer within 60 days of the date of a permanent change in the manner in which the supplier purchases fuel and must change the Fuel Purchase Plan within that 60 day period. Failure to do so may result in termination of the contract for default.

Information as outlined above is subject to audit.

U.S. Code, Title 18 (Crimes and Criminal Procedures), Section 1001, makes it a criminal offense to make a willfully false statement or representation herein.

I certify the fuel used on this route, totally or in part was ( ) was not ( ) purchased from a firm in which the supplier has a business interest, i.e., the firm is a subsidiary company, a company owned or controlled by the supplier or a firm in which the supplier is in a position to exercise some management either directly or indirectly.

I certify that the above information is accurate and complete to the best of my knowledge.

Date: _10/22/04_   Signature (original): _Cindy Bridwell_

HC131, June 2002

**Exhibit 2**

# FUEL STATEMENT FOR CONTRACT NO. _98010_

**A.**  Complete the shaded areas as applicable:

NOTE: TYPE OF FUEL PURCHASED MUST BE SELF SERVICE, WHENEVER AVAILABLE, AND IN ACCORDANCE WITH YOUR CONTRACT'S FUEL PURCHASE PLAN.

1. PLAN TYPE OF PURCHASE MADE:
- ( ) Wholesale
- (X) Retail-Commercial
- ( ) Retail-Supplier Owned

2. TYPE OF FUEL PURCHASED:
- (X) Diesel
- ( ) Unleaded
- ( ) Unleaded Plus
- ( ) Supreme Unleaded

- ( ) Regular
- ( ) Propane
- ( ) Gasohol
- ( ) Other _____

**B.**  Fuel Purchase Information (check appropriate type of purchase):

- (X) Daily Purchases - list purchases following instructions on reverse side of this statement.
- ( ) Bulk Purchase - complete information below
- ( ) Monthly Billing Purchase - complete information below

| Date of Bulk Purchase or Invoice Date | No. of Gallons | Purchased from (station or dealer) | Cost Per Gallon | Total Cost |
|---|---|---|---|---|
| | | | | |
| | | | | |
| Total Gallons: | | | Total Cost: | |

**C.**  Certification dates - 28 calendar day period covering _09/04/04_ through _10/01/04_

**D.**  Computation:

Total purchase cost / Total gallons purchased = Rate per gallon

(1) _51,137.21_ / (2) _26235.00_ = $ _1.9492_
(minus discount)

(Number of gallons from PS 7463)  X  _343,942.00_

Requested annual cost to enter in column II = $ _670,411.75_

<table>
<tr><td>

**CONTRACTING OFFICE USE ONLY**

Invoices verified by: _____

Effective Date: _9-4-04_

Allowable Rate: _1.9492_

</td></tr>
</table>

NOTE: ACTUAL RECEIPTS OR COPIES MUST BE INCLUDED WITH THIS FORM.

The supplier MUST notify the Contracting Officer within 60 days of the date of a permanent change in the manner in which the supplier purchases fuel and must change the Fuel Purchase Plan within that 60 day period. Failure to do so may result in termination of the contract for default.

Information as outlined above is subject to audit.

U.S. Code, Title 18 (Crimes and Criminal Procedures), Section 1001, makes it a criminal offense to make a willfully false statement or representation herein.

I certify the fuel used on this route, totally or in part was ( ) was not ( ) purchased from a firm in which the supplier has a business interest, i.e., the firm is a subsidiary company, a company owned or controlled by the supplier or a firm in which the supplier is in a position to exercise some management either directly or indirectly.

I certify that the above information is accurate and complete to the best of my knowledge.

Date: _10/22/04_   Signature (original): _Cindy Bridwell_

HC131, June 2002

FUEL STATEMENT FOR CONTRACT NO. _98010_

A.    Complete the shaded areas as applicable:

*NOTE: TYPE OF FUEL PURCHASED MUST BE SELF SERVICE, WHENEVER AVAILABLE, AND IN ACCORDANCE WITH YOUR CONTRACT'S FUEL PURCHASE PLAN.*

1. PLAN TYPE OF PURCHASE MADE:

( )  Wholesale
(X)  Retail-Commercial
( )  Retail-Supplier Owned

2. TYPE OF FUEL PURCHASED:

(X)  Diesel            ( )  Regular
( )  Unleaded          ( )  Propane
( )  Unleaded Plus     ( )  Gasohol
( )  Supreme Unleaded  ( )  Other _____

B.    Fuel Purchase Information (check appropriate type of purchase):

(X)  Daily Purchases - list purchases following instructions on reverse side of this statement.
( )  Bulk Purchase - complete information below
( )  Monthly Billing Purchase - complete information below

| Date of Bulk Purchase or Invoice Date | No. of Gallons | Purchased from (station or dealer) | Cost Per Gallon | Total Cost |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
| Total Gallons: |  |  | Total Cost: |  |

C.    Certification dates - 28 calendar day period covering _10-02-04_ through _10-29-04_

D.    Computation:

Total purchase cost  / Total gallons purchased = Rate per gallon

(1) _56,397.09_ / (2) _26578.121_ = $ _2.12194_
(minus discount)
(Number of gallons from PS 7463)  X  _343,942.00_

Requested annual cost to enter in column II = $ _729,824.29_

CONTRACTING OFFICE USE ONLY

Invoices verified by: _____

Effective Date: _10-2-04_

Allowable Rate: _2.12194_

**NOTE: ACTUAL RECEIPTS OR COPIES MUST BE INCLUDED WITH THIS FORM.**

The supplier MUST notify the Contracting Officer within 60 days of the date of a permanent change in the manner in which the supplier purchases fuel and must change the Fuel Purchase Plan within that 60 day period. Failure to do so may result in termination of the contract for default.

Information as outlined above is subject to audit.

U.S. Code, Title 18 (Crimes and Criminal Procedures), Section 1001, makes it a criminal offense to make a willfully false statement or representation herein.

I certify the fuel used on this route, totally or in part was ( ) was not (X) purchased from a firm in which the supplier has a business interest, i.e., the firm is a subsidiary company, a company owned or controlled by the supplier or a firm in which the supplier is in a position to exercise some management either directly or indirectly.

I certify that the above information is accurate and complete to the best of my knowledge.

Date: _11/15/04_    Signature (original): _Cindy Bridwell_

HC131, June 2002

KEITH STRANGE
VICE PRESIDENT, SUPPLY MANAGEMENT

 **UNITED STATES**
**POSTAL SERVICE**

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

January 25, 2006

Mr. Hal D. Hicks
2425 S. Atlantic Avenue PH5
Daytona Beach, FL 32119-5432

Dear Mr. Hicks:

The United States Postal Service (USPS) is immediately suspending you and proposing your debarment both pursuant to Title 39, Code of Federal Regulations (CFR), Section 601.113 (as revised effective May 19, 2005, copy enclosed), for your pleas of guilt as to criminal offenses involving the making of false statements, including one instance of making a false statement involving the performance of a government contract.

Specifically, on January 12, 2006, before a District Judge of the Southern District of Illinois, you entered a guilty plea as to willful and knowingly making a false, fictitious, and fraudulent statement, in that you falsified a "Fuel Use Certification" submitted to the USPS in connection with the performance of a mail transportation contract, in violation of Title 18, United States Code, Sections 1001 and 1002, and the willful and knowing subscription of an Internal Revenue Service form 1040, filed with the IRS, which was false as to a material matter, in violation of Title 26, United States Code, Section 7206(1).

Further, on September 30, 2005, the United States of America, plaintiff, filed against you and HHMT, Inc., a corporation which you controlled, a civil compliant asserting causes of action under the False Claims Act, seeking treble damages and civil penalties against you in the amounts of $168,036 and $2,475,000, respectively, and treble damages and civil penalties against HHMT, Inc. (jointly with you) in the amounts of $119,524 and $1,485,000, respectively, all arising out of the submission of false claims, statements, and certifications in connection with the performance of mail transportation contracts held with the USPS. (The fuel use certification the making of which you have plead guilty to was similarly with respect to a contract held by HHMT, Inc.) Because HHMT, Inc., is currently no longer extant as a entity, the Postal Service is not proposing to take any action against it, notwithstanding that the referenced civil complaint provides a basis for such action. However, as discussed below, certain directors of HHMT, Inc., are hereby suspended and proposed for debarment.

39 CFR 601.113(e) provides, in relevant part:

> The criminal, fraudulent, or improper conduct of an individual may be imputed to the firm with which he or she is or has been connected when an impropriety was committed. Likewise, when a firm is involved in criminal, fraudulent, or other improper conduct, any person who participated in, knew of, or had reason to know of the impropriety may be debarred.

And 39 CFR 601.113(e) and (i) provides that an affiliate of a debarred or suspended supplier (that is, "[a] business, organization, person, or individual connected by the fact that one controls or has the power to control the other or by the fact that a third party controls or has the power to control both") may be included in a debarment or suspension.

475 L'ENFANT PLAZA SW
WASHINGTON DC 20260-6200
202-268-4040
FAX: 202-268-2755

**Exhibit 3**

2

The Postal Service has identified the following individuals as persons connected with you to whom your criminal conduct may be imputed, and/or as your affiliates, and, accordingly, each of them and their named affiliates are hereby included within the scope of this suspension and proposed debarment:

> Shelly Lynn Myles (Chairman of the Directors of HHMT, Inc. during the time that you submitted false claims on its behalf), individually and d/b/a SLM Transportation, a sole proprietorship, and SLM Trans, Inc., a Maryland corporation, an affiliate of Shelly L. Myles, its President.

> Pam Mason (a director of HHMT, Inc., during the time that you submitted false claims on its behalf and whose signature appears on several of false claims submitted on the corporation's behalf as charged in the pending civil complaint against you and the corporation)

You and the above-named individuals and corporation are immediately suspended from contracting or subcontracting with the USPS for a period of one year, beginning January 26, 2006 and will remain in effect until January 26, 2007, unless the suspension is extended or sooner revoked or it is replaced by a debarment. During the period of the suspension, the Postal Service will not solicit proposals from any suspended entity. If such proposals are received, they will not be considered for award unless it is determined by the USPS to be in its interest to do so. Each suspended individual or corporation will be included on the Postal Service's list of debarred or suspended suppliers, and pursuant to 601.113(d)(5), new work (other than work added by service changes under mail transportation contracts) may not be added to existing contracts with those entities. Pursuant to 39 CFR 601.113(k)3., within 30 days of receipt of this notice, any suspended individual or firm may submit to the undersigned, in writing, any information or reason(s) that entity believes makes the suspension inappropriate.

The debarments proposed herein will be for a period of three years and will be effective no sooner than 30 days subsequent to the date of this notice. Pursuant to 39 CFR 601.113(h)1., within 30 days of this notice, any individual or corporation proposed for debarment may submit to the undersigned, in person or in writing, or through a representative, information and argument in opposition to the proposed debarment. In the event an entity does not submit information or argument in opposition to the proposed debarment within the time allowed, the debarment will become final as to it with no further review or appeal.

Sincerely,

Keith Strange

Enclosure

cc: w/enclosure

Ms. Shelly Myles
3300 Almaden Court
Bowie, MD 20716-3862

Ms. Pam Mason
6449 East IL 250
Claremont, IL 62421-2570

SLM Trans, Inc
8401 Corporate Drive, Suite 230
Landover, MD 20785-2267

SUSAN M. BROWNELL
VICE PRESIDENT, SUPPLY MANAGEMENT

 **UNITED STATES POSTAL SERVICE**

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

September 29, 2006

Douglas P. Roller, Esq.
Helfry, Neiers & Jones, P.C.
120 South Central, Suite 1500
Clayton, MI 63105-1796

Re: Debarment of Hal D. Hicks, et al.

Dear Mr. Roller:

By letter dated January 25, 2006, pursuant to 39 CFR 601.113, my predecessor as Vice President, Supply Management, immediately suspended, and proposed for debarment Mr. Hal D. Hicks and various named affiliates. The parties proposed for debarment were referred to the procedure at 39 CFR 601.113(h) 1., whereby they could submit information and argument in opposition to the proposed debarment. By letter dated February 23, and in subsequent correspondence and a meeting, you submitted such information and argument on behalf of Mr. Hicks. Having fully considered the material submitted, I have decided that it is appropriate to proceed with Mr. Hicks' debarment.

As previously noted, on January 12, 2006, Mr. Hicks entered a guilty plea in open court before the United States District Court for the Southern District of Illinois. Mr. Hicks admitted that he willfully and knowingly made a false, fictitious, and fraudulent statement, in that he falsified a "Fuel Use Certification" submitted to the United States Postal Service in connection with the performance of a mail transportation contract, in violation of Title 18, United States Code, Sections 1001 and 1002, and that he willfully and knowingly filed an IRS form 1040 with the IRS which was false as to a material matter, in violation of Title 26, United States Code, Section 7206(1). Postal regulations set forth at 39 CFR 601.113 (e) provides that I, with the concurrence of the General Counsel, may debar a supplier for the following causes: "1. Conviction of a criminal offense . . . in the performance of a contract or subcontract . . . . 3. Commission of . . . making false statements [or] tax evasion."

As I understand your statements on behalf of Mr. Hicks, Mr. Hicks does not dispute that the charges to which he pleaded are grounds for his debarment under 39 CFR 601.113(e) 1. and 3. Rather, he contends that various circumstances associated with those charges make his debarment "not appropriate." I respectfully disagree.

Section 39 CFR 601.113(f) of our regulations notes that debarment "must be made in the best interest of the Postal Service" and sets out ten factors which "may be assessed in determining the seriousness of the offense . . . and may be taken into account in deciding whether debarment is warranted." Measured against those factors, nothing in Mr. Hicks' submissions suggests that the offenses to which he admitted in his plea do not warrant debarment. He has not met his burden of demonstrating, to my satisfaction, that debarment is not warranted or necessary. The assertion by Mr. Hicks in the February 23 letter that his plea should excuse him from debarment is clearly not compelling.

475 L'ENFANT PLAZA SW
WASHINGTON, DC 20260-6200
202-268-4040
FAX: 202-268-2755
WWW.USPS.COM

A portion of the February 23 submission is devoted to the contention that Mr. Hicks was constructively debarred sometime after June 2001, by reason of the Postal Service's termination of his existing contracts or its failure to award him new ones, and you subsequently submitted two lists of routes that purportedly support this contention. The first list identifies nine routes said to have been terminated in the years 2001 through 2006. Our inquiry establishes, however, that contrary to your representations, only three of the contracts were terminated; two for default and one for the Postal Service's convenience. The other six were never terminated; each contract expired at the end of its contractual term. Termination for default is an action which a contractor may challenge in an appropriate forum; termination for convenience is a right granted by the contract for which the contractor is compensated. No impropriety is evident when a contract expires by its terms. Nor does the exercise of termination rights suggest an improper motive when the contractor has the opportunity to contest that exercise but does not.

The second list set out 90 highway contract routes (HCR) with identified "dates of solicitation" on which Mr. Hicks or his companies submitted proposals but did not receive contract awards. The vast majority of those solicitation dates were in calendar year 2002, with a few each in calendar years 2003 and 2004. The Postal Service maintains its database of contract routes by HCR route number in a system called the Transportation Contract Support System (TCSS). That system includes no record at all as to 10 of the route numbers on the Hicks list. Further, the TCSS has no record of 14 of the routes having existed in 2002 (the date associated with them on the list), and instead shows that they were created in later years. The TCSS shows that an additional 13 routes were in existence at the times associated with them on the Hicks list, but that they were not solicited as the list recites. Some had award or renewal dates inconsistent with the dates on the list, while others involved different termination dates than the list suggests.

As to the remaining solicitations, the TCSS indicates that 50 of the routes identified on the list were awarded to offerors at prices lower than those offered by Mr. Hicks. (In three of those cases, the Postal Service record reflects a higher offer from Mr. Hicks than does his list.) As to only three routes do postal records indicate that award was made to a supplier at a price higher than the price shown for Mr. Hicks or his companies. As to one such route, our records reflect that the Hicks entity failed to provide adequate documentation of insurance during preaward. As to the remaining two, we have no information on the basis for the award. That is not particularly surprising; the awards both occurred in 2002, and solicitation files are maintained in the purchasing office for only 120 days after award (USPS Mail Transportation Procurement Handbook, PO-513, para. 2.2.1). However, assuming that the Hicks list accurately recounts the Hicks participation in the solicitation, the fact that there are arguably two unexplained instances of award on a basis other than price is not sufficient for me to conclude that Mr. Hicks was deprived of contract awards to which he was otherwise entitled.

Having fully considered the matters in mitigation, remediation, and defense in Mr. Hicks' various submissions, I remain convinced that his debarment is appropriate. Accordingly, effective as of the date of this letter, Mr. Hicks is hereby debarred for a period of three years. (Mr. Hicks' affiliate Pam Mason was previously debarred for a period of three years ending March 28, 2009, and his further affiliate Shelly Lynn Myles, and her corporation, will be the subject of a separate determination.)

Sincerely,

*Susan M. Brownell*

cc:  Mr. Hal D. Hicks
     2425 S. Atlantic Avenue, PH5
     Daytona Beach, FL 32119-5432